399 So.2d 317 (1979)
Dudley Wayne KYZER, alias
v.
STATE.
6 Div. 655.
Court of Criminal Appeals of Alabama.
August 21, 1979.
Rehearing Denied October 2, 1979.
*319 Robert F. Prince, of McDuffie, Holcombe & Prince, Tuscaloosa, for appellant.
Charles A. Graddick, Atty. Gen., and J. Anthony McLain, Asst. Atty. Gen., for State.
TYSON, Judge.
Dudley Wayne Kyzer was charged in a six-count indictment under Alabama's Death Penalty Statute, § 13-11-1 through § 13-11-9, Code of Alabama 1975 (Act No. 213, General Acts of Alabama 1975), for first degree murder "wherein two or more human beings [were] intentionally killed by the defendant by one or a series of acts."[1] & [1a] The jury found the defendant "guilty of first degree murder with aggravated circumstances as charged in the indictment," and fixed the punishment at death. (R.p. 829) Thereafter, the trial court conducted a post conviction hearing on the aggravating and mitigating circumstances pursuant to § 13-11-3 et seq., Code of Alabama 1975. The trial judge then set punishment at death by electrocution after making specific findings on the aggravating and mitigating circumstances.[2] (R.p. 833-837)
At arraignment the appellant entered a plea of not guilty and not guilty by reason of insanity. Pursuant to defense motion, appellant was ordered committed to Bryce Hospital for psychiatric evaluation and examination to determine whether he was competent to stand trial. (R.p. 766-767) Criminal proceedings against appellant were resumed upon the trial court's receipt of the results of the lunacy commission's study of the appellant's mental condition pursuant to § 15-16-20, Code of Alabama 1975. (R.p. 768)
The issues on this appeal deal exclusively with matters pertaining to the post-conviction hearing conducted by the trial judge on the aggravating and mitigating circumstances. Consequently, our description of the evidence adduced at trial appears in an abbreviated format.
On Sunday, October 31, 1976, Emily Diane Kyzer, Eunice Barringer and Richard Pyron were found dead by the police at the home of Mrs. Barringer at 1232 Thirteenth Avenue, East, Tuscaloosa, Alabama. All three victims had been shot to death. The first officers on the scene found ambulance personnel working over the body of Emily Diane Kyzer. Ms. Kyzer had received one gunshot wound to the chest cavity which penetrated the heart. Ms. Kyzer was lying in the driveway leading from the street in front of Mrs. Barringer's house. Upon entering the house through the carport, which was situated on the end of the rectangular-shaped house, investigating officers found the body of Richard Pyron in front of a chair in a kneeling position in the den of the house. Mr. Pyron had been shot twice: a bullet entered his right shoulder exiting through his back and lodging in the den wall; a second bullet entered his skull from the top traveling downward through the brain and lodging in his neck. In one of the bedrooms in the house, officers found the body of Mrs. Eunice Barringer. Mrs. Barringer had been shot once in the head just over her right eye from very close range as revealed by gun powder surrounding the entrance wound. Officers found the telephone in the den with the receiver removed from its cradle. No other persons were found in the house by the police. Investigation revealed that Eunice Barringer was the mother of Emily Diane Kyzer who had been twice divorced from the appellant.
Chief investigating officer Shirley Fields with the homicide unit of the Tuscaloosa Police Department interviewed six-year old Chris Kyzer shortly after the investigation at the scene commenced. Officer Fields learned, and young Chris later testified, *320 that he was present at the home of Mrs. Barringer when his father, Dudley Wayne Kyzer, arrived. The appellant forced his way into the kitchen from the carport area where young Chris was playing with some stray puppies. Chris followed his father into the kitchen and noted that his mother and appellant immediately began quarrelling. Chris recalled that Richard Pyron and Mrs. Barringer were in the den together. Chris stated under oath that he saw appellant, his father, draw a gun from his belt when Mrs. Barringer picked up the telephone receiver to make a call. Immediately, Emily Diane Kyzer told Chris to run out the door as she pushed him in that direction. As he was exiting, Chris saw his father fire one shot towards the den wall where Mrs. Barringer and Richard Pyron were located. Once outside, Chris heard one additional shot as he ran. Chris testified that he and his mother ran out the door together. Chris ran to a neighbor's house and did not see where his mother went.
On the Sunday afternoon in question, several of Mrs. Barringer's neighbors were outside playing with children, or performing household chores or duties, etc. Mr. Louis Holt, a nearby neighbor of Mrs. Barringer, was inside his house when he heard what he thought were two gunshots. Looking from his front window, Mr. Holt then saw Emily Diane Kyzer and Chris Kyzer running from the Barringer house towards his house. Mr. Holt saw Chris' mother fall in the driveway. Chris arrived at Mr. Holt's door moments later. Upon learning what had happened, Mr. Holt immediately telephoned the police. Sometime later during the investigation by the police, Mr. Holt witnessed the taking of Chris' statement by Officer Fields.
Soon after Chris had arrived at Mr. Holt's house and the police had been summoned, Mr. Holt saw two other neighbors, Mr. Winston Owens and Mr. Charles Hester, slowly pass his house in a pick-up truck moving in the direction of the Barringer house. Mr. Holt went to his front door and motioned to the men in the truck instructing them to stay away from the Barringer house. Mr. Owens then backed his truck away from the Barringer house. Mr. Hester and Mr. Owens had been standing together talking when they both heard sounds that Mr. Hester thought were Halloween fireworks. The men exchanged comments about the noise as they observed Emily Diane Kyzer and Chris Kyzer run from the Barringer house. When Ms. Kyzer fell in the driveway, the men focused their attention on her to attempt to see whether she was hurt. Another neighbor, Mrs. Margaret Warbington, also heard the sounds and was discussing them with Mr. Owens and Mr. Hester when they all observed an unfamiliar maroon or burgundy colored automobile with a black vinyl top slowly pass by them at a normal rate of speed. None of the neighbors recalled the license plate numbers but Mr. Hester observed that the automobile was equipped with a trailer hitch. Mr. Hester described the driver as being a white male with light brown, long hair and a full beard. It was at this point that Mr. Hester and Mr. Owens drove in the pick-up truck towards the Barringer house to see what was wrong with the woman who had fallen in the driveway.
Freddie Sherrill, a life-long friend of the appellant, testified that on the afternoon in question between 5:15 and 5:30 p. m., the appellant arrived at his trailer on the east side of Tuscaloosa. The appellant drove around behind Mr. Sherrill's trailer and parked his maroon and black Buick automobile in Mr. Sherrill's garage despite the fact that numerous paint cans were in his path on the garage floor. Mr. Sherrill's description of appellant's appearance matched that given by Mr. Hester.
When Mr. Sherrill approached the appellant he was standing beside his car. Appellant mumbled something about "ending it all" and drew an automatic pistol from his belt, raised it to his head and attempted to pull the trigger but the pistol was apparently jammed. Appellant told Mr. Sherrill that he was in serious trouble and asked to borrow Mr. Sherrill's motorcycle, a Kawasaki 900 model. Appellant then left on the motorcycle.
*321 Appellant drove the motorcycle from Tuscaloosa to Selma, Alabama, where he telephoned his aunt, Nell Clausen, at approximately 7:00 p. m. At Ms. Clausen's home, the appellant drove the motorcycle up some steps and into the living room of her apartment. Appellant said very little to his aunt other than that he was in trouble, needed her beige Volkswagen automobile and as much money as she could give him. Appellant also said "I've got to get away." (Rp. 216) After five or ten minutes, appellant left in his aunt's automobile with a small amount of money she had given him.
The following day appellant arrived at a used car lot in Pensacola, Florida, owned by Charles Tucker, who was a native of Tuscaloosa and an old friend of the appellant. The appellant entered Mr. Tucker's office in the morning and after exchanging greetings asked to borrow an automobile and for a place to stay for a couple of days. Appellant said he was in some trouble. (R.p. 247) Mr. Tucker explained that he could not help him with either of his requests but offered appellant twenty-five dollars in the form of a loan. Appellant took the money and left.
Mr. T. L. Sexton, a resident of Atlanta, Georgia, testified that he received a telephone call from the appellant between 12:00 and 2:00 p. m. on Tuesday, November 2, 1976. Appellant was lost in Atlanta and sought directions to Mr. Sexton's place of business. Mr. Sexton had known appellant's mother from his childhood and, consequently, had known appellant most of his life. When the appellant arrived at Mr. Sexton's office, Mr. Sexton asked him to wait because he was busy with business matters. Later, after the appellant had washed and shaved his face, the appellant gave Mr. Sexton a very sketchy account of the incident at the Barringer house. According to Mr. Sexton, appellant said he had gone to the home of his former mother-in-law to pick up a jacket left there earlier. When he arrived, his mother-in-law attempted to call the police and then a gun was fired in the room. The appellant was not sure who had fired the gun.
Mr. Sexton then called Tuscaloosa to find out exactly what had happened at the Barringer house. Upon learning of the triple homicide, Mr. Sexton told the appellant that his wife, his mother-in-law and another man were dead. Appellant's sobbing response was, "Three people, my wife, too?" (R.p. 230)
At this point, Mr. Sexton took appellant to his home where he showered, put on clean clothes and ate some food. Nothing further was said until Mr. Sexton decided to telephone appellant's father about what action should be taken. The decision was made to return the appellant to Tuscaloosa. About midnight, appellant's father and mother, aunt and uncle arrived at the Sexton house in Atlanta. Together they drove the appellant back to Tuscaloosa where they turned him over to the authorities.
Further evidence presented by the State on its case in chief showed that Mrs. Barringer, Emily Diane Kyzer and Richard Pyron were killed by projectiles fired from the same .380 caliber automatic pistol. The State presented testimony which tended to show that the appellant had owned a Browning .380 caliber automatic pistol and had acquired a permit, dated April 23, 1974, for the weapon in the name of his wife, Emily Diane Kyzer. (R.p. 498) There was additional evidence showing that appellant had purchased .380 caliber ammunition as recently as June 4, 1976, from a sporting goods store in Tuscaloosa. A total of five spent .380 caliber automatic shell casings were found by the police in the Barringer house. The brand name on these shell casings was the same as that purchased by appellant.
Ms. Bootsie Birthright testified that she was invited by the appellant to attend a Halloween party sponsored by an organization known as Parents without Partners. Ms. Birthright and the appellant were together from approximately 8:00 p. m. until 2:00 a. m. the night of October 30, 31, 1976, the night before the shooting at the Barringer house. When asked to describe appellant's behavior during the time they spent together, Ms. Birthright stated that *322 appellant was very nice to her: the perfect gentleman. (R.p. 602) Ms. Birthright estimated that appellant drank anywhere from two to five beers during the evening.
The case for the defense began with the testimony of a life-long friend of the appellant, one Cecil Ethridge. Mr. Ethridge recalled an event involving the appellant which, in his view, had a profound impact on the appellant's life. The appellant and the witness were playing baseball in a vacant lot one day in the year 1957, when they were about fifteen years old. A boy named Marty Turk, who was about ten or eleven years old, asked to join them in their play. Reluctantly, the older boys consented to let Marty Turk pitch the ball to them and chase the ball after it was hit. When Marty Turk pitched the ball to appellant, he unintentionally hit the ball directly back to Marty Turk. The ball struck Marty Turk in the head. The young boy seemed to have sustained nothing more than a bump on the head and walked home under his own power. However, some consequential complications developed that night and Marty Turk died in the hospital. Mr. Ethridge said appellant blamed himself for the boy's death.
As appellant grew older, Mr. Ethridge observed appellant's regular consumption of beer increase to the point that it became a serious problem. Appellant's behavior during periods of intoxication was sometimes uncontrolled and potentially dangerous. Mr. Ethridge recounted one episode during one of appellant's previous marriages when he discharged a double-barrel shotgun in his apartment, his target being a photograph of his mother-in-law at that time. This particular episode was central in the divorce proceedings that followed.
Several witnesses who had known appellant for many years, including his mother and father, related episodes of bizarre or highly inappropriate behavior on the part of the appellant. However, in each case the appellant was under the influence, to some extent, of alcohol. Some of these witnesses were allowed to testify that in their opinion appellant was insane. Others qualified their characterizations of appellant by saying, in effect, when he drinks, he is insane.
The defense offered the testimony of several expert witnesses who had examined appellant at Bryce Hospital during the time immediately after his arrest. Dr. Joe Woddail, a qualified psychiatrist, testified that he sat on the examining board on December 15, 1976, which met to determine appellant's competency to stand trial. The board's conclusion was that, at that point, appellant was not competent to stand trial. On April 8, 1977, appellant was declared competent to stand trial.
Dr. Woddail conducted a glucose tolerance test on the appellant on December 28, 1976. His interpretation of the results of that test was that the appellant was suffering from a condition known as hypoglycemia or low blood sugar.[3] Dr. Woddail stated that a person with a hypoglycemic condition and under stress would be likely to experience an adverse reaction which might manifest itself in violent behavior. During such a reaction many people, in Dr. Woddail's opinion, are unable to distinguish right from wrong.
Dr. Woddail described an interview with appellant conducted while appellant was in jail. Appellant seemed withdrawn and depressed which made the encounter relatively fruitless as an evaluation of his mental status. (R.p. 486) Dr. Woddail recalled that appellant cried profusely when he recounted the events surrounding the death of Marty Turk.
Nancy McCarter, a Substance Abuse Counselor at the Indian Rivers Mental Health Center, testified that she had interviewed appellant fifteen to twenty times while he was incarcerated following his arrest and discharge from Bryce Hospital. Ms. McCarter described appellant as "quite depressed" with expressions of suicidal ideations upon which he acted on one occasion. (R.p. 412) During her interviews, Ms. McCarter learned that appellant felt deep sadness and guilt when he spoke of the *323 death of Marty Turk. On cross-examination, Ms. McCarter stated that it would not be unusual for anyone to become depressed when placed under the circumstances surrounding her interviews with the appellant. Ms. McCarter stated that appellant told her that he was under the combined influence of alcohol and amphetamines when the incident at the Barringer house occurred.
Mrs. Mary Tool testified that appellant was at her home on October 31, 1976, from about 9:30 a. m. until a few minutes after 4:00 p. m. During his visit, appellant continuously consumed beer. His behavior was loud and rowdy. Mrs. Tool stated that during her acquaintance with appellant, which stemmed from a common past employment, she had learned that appellant behaved entirely different when he did not drink: he was quiet, polite and softspoken. Mrs. Tool recounted a past event involving appellant wherein he drove his automobile into her front yard at 2:00 or 3:00 a. m. and awakened her by discharging a pistol several times. Mrs. Tool took the pistol from appellant, who was intoxicated, and put him to bed on her sofa. Two weeks later, when Mrs. Tool returned appellant's pistol, he had no recollection of the episode. Mrs. Tool confirmed that appellant's automobile was a maroon Buick and that when he left her house sometime after 4:00 p. m. on October 31, 1976, he was driving that automobile.
Ms. Patricia Larkin, a qualified forensic psychologist at Bryce Hospital, testified that she administered certain recognized psychological tests to appellant while he was a patient at Bryce Hospital. Based on data gained from these tests and her training in the interpretation of same, Ms. Larkin entered the following report concerning appellant's personality structure and functioning: (R.p. 545)
"Mr. Kyzer does not appear to have a major psychiatric disability. His MMPI profile remains essentially unchanged from his earlier results. He is an individual who is highly defended against admitting to personality problems. Instead, focusing on somatic complaints which may provide a legitimate reason for seeking nurturing, protection, and caring from others. While sober, he is able to project a `nice-guy' image, but his underlying rage and frustration flood his ego and overcomes his control when he is drinking. At this timethese times, [sic] he becomes pugnacious, assaultive and dangerous. At this time, Mr. Kyzer is very depressed and making great effort to maintain ego control at a time when, in reality, he has little or no control over his future as his trial approaches in September. As stress continues and external pressures mount, Mr. Kyzer may seek suicide as his only avenue of escape."
Dr. Don Weston, a qualified psychiatrist, testified that he interviewed the appellant in jail on three occasions in May and June of 1977. Based on the information collected during these interviews, Dr. Weston diagnosed the existence of a disorder in the appellant known as manic-depressive syndrome. Dr. Weston estimated that this condition had existed in the appellant for approximately fifteen years. However, because of the unpredictability of the cycles involved with this disorder, Dr. Weston was unable to state whether appellant was in the mania or the depression stages when the shooting at the Barringer house occurred. Dr. Weston noted that characteristically the manic-depressive person, when crossed or blocked, tends to become abusive, assaultive or dangerous. Dr. Weston explained that the existence of hypoglycemia would aggravate the problems associated with a manic-depressive disorder. (R.p. 616) On cross-examination, Dr. Weston stated that the basis of his diagnosis of appellant's condition was the appellant's description of his own behavior over a period of years and information gained from a person who had known appellant all his life. Dr. Weston did not use any of the standard, widely recognized psychiatric tests in his evaluation and diagnosis of the appellant.
On rebuttal, the State presented the testimony of Dr. Buris Boshell, Medical Director of the Diabetes Hospital at University Hospital in Birmingham, Alabama. Dr. Boshell testified that he is the Chief of the *324 Division of Endocrinology and Metabolism and Director of the Diabetes Research and Training Center. Dr. Boshell stated that he had done extensive research in the past and had written numerous articles published in recognized medical journals on the condition known as hypoglycemia. After examining the results of appellant's glucose tolerance test, Dr. Boshell concluded, based on his extensive training and experience, that the results were within the normal range i. e. the appellant's test results showed no signs of hypoglycemia. Dr. Boshell explained that, generally speaking, a person experiencing the effects of hypoglycemia would feel relief from those effects after consumption of beer.

I
The sole statutory aggravating circumstance found to exist by the trial court in its written findings of fact (See Appendix B) was that "the capital felony was especially heinous, atrocious or cruel". Appellant asserts that such finding by the trial court was erroneous because it is unsupported by the evidence. Collaterally, the appellant argues the State failed to prove the existence of said aggravating circumstance beyond a reasonable doubt.
This Court, in Jacobs v. State, Ala.Cr.App., 361 So.2d 607 (1977) affirmed, Ala., 361 So.2d 640 (1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979), adopted the interpretation of the Florida Supreme Court in State v. Dixon, 283 So.2d 1 (Fla.1973) with respect to the language of the statutory aggravating circumstances sub judice:
"`The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony. Fla.Stat. § 921.141(6)(h), F.S.A. Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" Jacobs, supra at 633.
This court finds that the trial court properly applied the language of § 13-11-6(8), Ala.Code (1975) to the facts of the instant case. We further support each ground listed by the trial court in its findings of fact for justification of its application of said statutory language. In addition, this Court independently finds that the evidence in this case is sufficient to justify finding that the capital felony was especially heinous, atrocious or cruel. "The killing[s], while not inflicting a `high degree of pain,' or unusual suffering, could be deemed `extremely wicked', or `vile' under the peculiar circumstances of this case. Jacobs v. State, supra at 639 (Bookout, J., concurring specially).
A related issue raised by appellant concerns whether the prosecution met its burden of proof with respect to the statutory aggravating circumstance. In Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the United States Supreme Court required the sentencing process to comply with the requirements of the Due Process Clause of the Fourteenth Amendment:
"[I]t is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. Even though the defendant has no substantive right to a particular sentence within the range authorized by statute, the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel.... The defendant has a legitimate interest in the character of the procedure *325 which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process." 430 U.S. at 358, 97 S.Ct. at 1204 (citations omitted)
In Evans v. Britton, No. 79-0200-H (S.D.Ala. June 12, 1979), the petitioner asserted that due process required the statutory aggravating circumstances, as elements of the punishment, to be proved beyond a reasonable doubt. Distinguishing substance from procedure, the Federal Court stated:
"Substantively, no defendant may be convicted under the Alabama death penalty statute without proof beyond a reasonable doubt of a violation of some provision of section 13-11-2(a) of the Alabama Code. Due process entitles defendants to nothing more. Procedurally, a defendant who has been convicted of a capital crime is entitled to have the trial judge consider the statutorily prescribed aggravating and mitigating circumstances, and a trial judge imposing a death sentence is required to enter specific findings respecting such circumstances. During this process the defendant is entitled to put on evidence in favor of mitigating or in opposition to aggravation, but the petitioner here contends that the capital defendant has a fundamental right to have any aggravation present in his case to be proved beyond a reasonable doubt. If the question of aggravation in capital cases under the Alabama statute were submitted to the jury, then this Court would be inclined to follow the lead in Spinkellink v. Wainwright, 578 F.2d 582, 610 (5th Cir. 1978), and State v. Dixon, 283 So.2d 1, 9 (Fla.1973), and rule that the jury must be instructed that aggravating circumstances must be established by proof beyond a reasonable doubt before the jury could consider such circumstances in deliberating a death sentence case. Under Alabama law, however, the trial judge is the sentencing authority upon whom rests the burden of weighing the aggravating and/or mitigating circumstances. The defendant cannot, as far as the Court can ascertain, be convicted of a capital crime under Alabama statute without proof beyond a reasonable doubt of at least one of the statutorily prescribed aggravating circumstances, since a reading of the statute reveals that the aggravating circumstances set out in section 13-11-6 actually define the capital crimes set out in sections 13-11-2(a)(1)-(14)." Evans, supra. (Footnotes omitted)
However, in the instant case, the sentencing judge set out an aggravating circumstance in his written findings of fact that is not definitional of the crime for which appellant stands convicted. In other words, proof that is sufficient to establish the appellant's commission of the capital felony beyond a reasonable doubt in the mind of the jury, may not necessarily be sufficient to establish that "the capital felony was especially heinous, atrocious or cruel" beyond a reasonable doubt. Therefore, in order for the appellant's death sentence to satisfy due process requirements, this Court must find that the State successfully carried its burden of proof at the post-conviction hearing.
In making our determination in this regard, this Court adheres to the standard of review applied when the propriety of a jury verdict is squarely presented for appellate review. Thus, the determination of the sentencing court with respect to its weighing of the aggravating and mitigating circumstances will not be reversed, unless after allowing all reasonable presumptions in favor of its correctness, the preponderance of the evidence against the sentencing court's determination is so decided as to clearly convince the appellate court that it is wrong and unjust. Cf. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969):
"It is apparent that the question for this Court is whether the review procedure adopted by the Alabama [Death Penalty] statute properly requires appellate courts in capital cases to conduct their review in such a manner as will ensure that the death penalty is imposed only for the most serious crimes and only in circumstantially similar cases.
*326 ". . .
"The record is clear that the review scheme permitted by the Alabama death penalty [statute] is compatible with the teachings of Gregg, Proffitt, and Jurek, since the process ensures the adequacy of the trial and sentencing process and that the death sentence will be imposed uniformly for similar serious offenses, rather than freakishly or wantonly, as condemned by Furman." Evans v. Britton, No. 79-0200-H (S.D.Ala. June 12, 1979)
At the post-conviction hearing, the State, through the testimony of Investigator Shirley Fields, successfully introduced police photographs of the bodies of Richard Pyron, Eunice Barringer and Emily Diane Kyzer. The State submitted the autopsy reports on each of the three victims. Finally, the State relied on the evidence presented at trial in support of its case for imposition of the death penalty.
It is our opinion that the sentencing court's finding with respect to the existence of the aggravating circumstances enumerated in § 13-11-6(8) Ala.Code (1975) was, in all respects, proper.

II
Appellant asserts error in the sentencing court's failure to find the existence of any mitigating circumstances in its findings of fact. (See Appendix B). Appellant asserts that the evidence at trial was sufficient for the application of three statutory mitigating circumstances e. g. § 13-11-7(1), § 13-11-7(2), and § 13-11-7(6), Ala.Code (1975).
At the post conviction hearing, records on the appellant from the Tuscaloosa City Court, District Court and Circuit Court were admitted into evidence. These records showed fourteen misdemeanor charges and one conviction for malicious destruction of private property. The arrest warrant and complaint against appellant for assault and battery signed by Emily Diane Kyzer on October 26, 1976, as well as the divorce decree dissolving the marriage of Emily Diane and Dudley Wayne Kyzer were admitted into evidence. Our examination of the sentencing court's findings of fact reveals nothing improper in the court's determination reached with regard to appellant's prior criminal activity as specified in the statute.[4]
The appellant asserts that the sentencing court's determination with respect to the statutory mitigating circumstances enumerated in § 13-11-7(2) and § 13-11-7(6) Ala.Code (1975), was based solely on the jury's rejection of the appellant's plea of not guilty by reason of insanity. Our reading of the sentencing court's findings of fact leads us to a different conclusion.
Clearly, the sentencing court made an independent assessment of the evidence presented and determined, independently of the jury's verdict, that the statutory mitigating circumstances were inapplicable to appellant. We quote with approval the Florida Supreme Court's interpretation of the exact same statutory language as that contained in § 13-11-7(2) and § 13-11-7(6), Ala.Code (1975):
"Extreme mental or emotional disturbance is a second mitigating consideration, pursuant to Fla.Stat. § 921.141(7)(b), F.S.A., which is easily interpreted as less than insanity but more than the emotions of an average man, however inflamed.
". . .
"Mental disturbance which interferes with but does not obviate the defendant's knowledge of right and wrong may also *327 be considered as a mitigating circumstance. Fla.Stat. § 921.141(7)(f), F.S.A. Like subsection (b), this circumstance is provided to protect that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state." State v. Dixon, 283 So.2d 1 (Fla.1973)
We note that the sentencing court heard evidence at the post-conviction hearing that was not specifically referable to any of the statutory mitigating circumstances. Thus, it is clear that the sentencing court considered evidence as to "any matter that the court deem[ed] relevant to sentence," and was not restricted to those mitigating factors statutorily defined.
It is, therefore, our considered judgment that no error was committed in the failure of the sentencing court to find the existence of any mitigating circumstances in this case. We hold that the appellant has not presented sufficient grounds for this Court to reverse the sentencing court's imposition of the death penalty in this case. The conviction and sentence are, in all respects,
AFFIRMED.
All the Judges concur.
 Appendix A
INDICTMENT
THE STATE OF ALABAMA) | CIRCUIT COURT
 }
 TUSCALOOSA COUNTY | JANUARY Term, 1977
I. The Grand Jury of said County charge that before the finding of this Indictment DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought, intentionally kill Emily Diane Kyzer by shooting her with a pistol, and the Grand Jury further charge that the said killing was perpetrated by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer and Eunice Barringer, were unlawfully and with malice aforethought killed intentionally by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, by shooting each of them with a pistol,
II. The Grand Jury of said County further charge that before the finding of this Indictment, DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought intentionally kill Emily Diane Kyzer by shooting her with a pistol, and the Grand Jury further charge that the said killing was perpetrated by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer and Richard Pyron, were unlawfully and with malice aforethought killed intentionally by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, by shooting each of them with a pistol,
III. The Grand Jury of said County further charge that before the finding of this Indictment, DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought intentionally kill Emily Diane Kyzer by shooting her with a pistol, and the Grand Jury further charge that the said killing was perpetrated by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer, Eunice Barringer and Richard Pyron, were unlawfully and with malice aforethought killed intentionally by the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, by shooting each of them with a pistol,
IV. The Grand Jury of said County further charge that before the finding of this Indictment, DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is *328 otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought kill two or more human beings, to-wit: Emily Diane Kyzer and Eunice Barringer, intentionally, by shooting each of them with a pistol, and the Grand Jury further charge that the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, did kill both the said Emily Diane Kyzer and the said Eunice Barringer, by shooting each of them with a pistol, by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer and Eunice Barringer, were intentionally killed unlawfully and with malice aforethought.
V. The Grand Jury of said County further charge that before the finding of this Indictment, DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought kill two or more human beings, to-wit: Emily Diane Kyzer and Richard Pyron, intentionally, by shooting each of them with a pistol, and the Grand Jury further charge that the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, did kill both the said Emily Diane Kyzer and the said Richard Pyron by shooting each of them with a pistol, by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer and Richard Pyron, were intentionally killed unlawfully and with malice aforethought.
VI. The Grand Jury of said County further charge that before the finding of this Indictment, DUDLEY WAYNE KYZER, alias WAYNE KYZER, whose name is otherwise unknown to the Grand Jury, did unlawfully and with malice aforethought, kill two or more human beings, to-wit: Emily Diane Kyzer, Eunice Barringer, and Richard Pyron, intentionally, by shooting each of them with a pistol, and the Grand Jury further charge that the said DUDLEY WAYNE KYZER, alias WAYNE KYZER, did kill the said Emily Diane Kyzer, and the said Eunice Barringer, and the said Richard Pyron, by shooting each of them with a pistol, by one act or a series of acts wherein two or more human beings, to-wit: Emily Diane Kyzer, Eunice Barringer, and Richard Pyron, were intentionally killed unlawfully and with malice aforethought,
against the peace and dignity of the State of Alabama. WAYNE WILLIAMS
 District Attorney
 Sixth Judicial Circuit
 Appendix B
STATE OF ALABAMA )
 IN THE CIRCUIT COURT OF
VS. )
 THE SIXTH JUDICIAL CIRCUIT
DUDLEY WAYNE KYZER, )
 OF ALABAMA
 DEFENDANT. )
 CASE NO. 6810-B
 )

FINDINGS OF FACT FROM THE TRIAL AND THE SENTENCE HEARING AS REQUIRED BY TITLE 15, SEC. 342(6), OF THE CODE OF ALABAMA, AS AMENDED (1975)
JOSEPH A. COLQUITT, Circuit Judge.
The Defendant, Dudley Wayne Kyzer, was indicted, tried, and convicted of Murder in the First Degree Under Aggravated Circumstances. The jury, pursuant to law, fixed the punishment at death. Specifically, the Defendant was charged with the First Degree Murder of Emily Diane Kyzer, wherein two or more human beings, namely, Emily Diane Kyzer, Eunice Barringer, and Richard Pyron, were killed by the Defendant by one or a series of acts, an offense punishable as an aggravated offense for which the death penalty can be imposed. Title 15, § 342(4)(j), Code of Alabama, as amended (1975).
The Court after holding a hearing as provided by Title 15, § 342(5), Code of Alabama, *329 as amended (1975), and after weighing the aggravating and mitigating circumstances is unable to find sufficient reason to refuse to accept the death penalty as fixed by the jury, and accordingly accepts the jury verdict and sentences the Defendant Dudley Wayne Kyzer to death. Title 15, § 342(6), Code of Alabama, as amended (1975).
The Court finds from the evidence presented at trial and the sentence hearing that the Defendant Dudley Wayne Kyzer did in fact commit the offense of Murder in the First Degree Under Aggravated Circumstances as defined by Title 15, § 342(4)(j), Code of Alabama, as amended (1975). The Court further finds that this capital felony was especially heinous, atrocious and cruel, an aggravating circumstance set forth in Title 15, § 342(8)(h), Code of Alabama, as amended (1975).
The evidence is overwhelming, leading to a well-guarded and dispassionate judgment, that the Defendant Dudley Wayne Kyzer committed the crime charged. The evidence further shows that the Defendant commenced an assault upon three unarmed persons with a pistol in the private home of two of the victims. At that time he was under bond to appear in the County Court of Tuscaloosa County, Alabama, to answer to criminal charges pending against him. He had been charged with allegedly assaulting Diane Kyzer. He had also been charged with allegedly destroying some private property of Mrs. Eunice Barringer.
Further the attack on the three persons killed on this occasion was commenced in the presence of the minor son of the Defendant and Emily Diane Kyzer. The physical evidence in this case points to a methodical execution of three people. The circumstances, testimony, and physical evidence amply indicates that Emily Diane Kyzer received a fatal wound while attempting to remove the child from the room. She suffered a penetrating gunshot wound of the right breast, which penetrated both lungs and both atria of the heart causing massive hemorrhage, shock and death. Richard Pyron suffered a non-fatal gunshot wound to the left should which entered from the front and exited the rear. This wound fractured the humeral head and acromion. He suffered a fatal gunshot wound of the vertex of the head, the route of which was essentially vertical from the top, right side of the head, and which penetrated the cerebrum and lodged in the temporal bone. That wound had all the earmarks of a coup de grace. Eunice Barringer suffered a fatal gunshot wound over the right eye which traversed the brain, the route of which was downward at approximately 50 degrees from the horizontal. The wound was surrounded by gunpowder stippling covering an area approximately three inches in diameter. The gunshot was classified as "near contact" by the pathologist. The locations of the bodies and type of wounds indicate a brutal, savage, barbaric killing of three human beings, certainly meeting the criteria set forth in Title 15, § 342(8)(h), Code of Alabama, as amended (1975).
The Court has reviewed the facts of the case with the purpose of finding any mitigating circumstances as defined in Title 15, § 342(9), Code of Alabama, as amended (1975). Subsections (c), (d), (e) and (g) have no application to this case. Subsections (a), (b), and (f) were argued by the Defense to have application to this case, and therefore the Court specifically addresses those provisions.
The Court finds that the Defendant has no prior felony convictions. The Court further finds this fact insufficient to outweigh the aggravating circumstances of this case. The Court further finds from the evidence that while the Defendant has no prior felony convictions, the Defendant does have a history of prior conduct that could be considered criminal activity, and these prior activities are significant.
Defense Trial Exhibit 3, the records of Bryce Hospital, indicate a history reported by the Defendant of "lots of arrests ... for everything." "You write it down and I've been arrested for it." While perhaps boastful, the records of the County and City do show a number of arrests for mainly misdemeanors. *330 But the testimony, most of which was admitted on the issue of insanity at the instance of the Defense, shows a number of episodes involving destruction of property by shooting, threats, fighting and other improper, illegal or criminal conduct, for which the Defendant apparently was either never arrested or simply deferred for alternate treatment.
The Court finds no sufficient evidence to show that the Defendant was under the influence of extreme mental or emotional disturbance. Further, the Court finds no sufficient evidence to show that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The jury, by their verdict, found the Defendant sane. Defense exhibit 3 contains the records of Bryce Hospital, which includes several findings by the hospital staff that the Defendant was sane, including one finding that the Defendant was sane at the time of the commission of this crime.
Defense Exhibit 3, the Bryce records, reflect a number of findings by the professional staff of Bryce, including a finding and report of a Lunacy Commission that "Mr. Kyzer is not suffering from any mental disease or defect that would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the alleged crime." Other evaluations include "reactive depression without other significant psychiatric impairment." The Defendant was found to be of "superior intellect." "When drinking he is pugnacious, assaultive, and dangerous." It was further observed that he had "no major psychiatric disability."
Further, there is no sufficient evidence of intoxication to the degree required to substantially impair his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
Having found no mitigating circumstances sufficient to overcome the aggravating circumstances previously discussed, the Court finds no useful purpose served by discussing the State's argument that the aggravating circumstances set out in Title 15, § 342(8), subsections (c) and (d), Code of Alabama, as amended (1975), apply to this case.
This the 6th day of October, 1977.
NOTES
[1] See indictment attached hereinafter as Appendix A.
[1a] See 13-11-2(a)(10), Code of Alabama 1975.
[2] See trial court's findings of fact attached hereinafter as Appendix B.
[3] See Ellenburg v. State, Ala.Cr.App., 353 So.2d 810 (1977).
[4] On page 328, Appendix B, the third and fourth paragraphs of the trial court's findings, it is our understanding that the trial court was refuting the mitigating circumstance set out in § 13-11-7(1), "The defendant has no significant history of prior criminal activity."

We distinguish this finding from the one in Cook v. State, Ala., 369 So.2d 1251 (1978), wherein the trial court improperly qualified the above provision.
In the instant cause, the trial judge did find the prior criminal activity to be significant and therefore could not operate as a mitigating circumstance in the appellant's favor.
This evidence of prior criminal activity was introduced by the appellant in support of his plea of insanity, and the trial court found that such was not sufficient to show that the appellant was acting under the influence of extreme mental and emotional disturbance.