380 So.2d 1003 (1980)
Gregory A. COOPER, alias
v.
STATE.
4 Div. 765.
Court of Criminal Appeals of Alabama.
January 22, 1980.
Rehearing Denied February 26, 1980.
Cary L. Dozier, Troy, for appellant.
Charles A. Graddick, Atty. Gen., Thomas R. Allison, Asst. Atty. Gen., for appellee.
BOWEN W. SIMMONS, Retired Circuit Judge.
Appellant-defendant, an indigent, was indicted, tried before a jury, convicted, and sentenced to five years imprisonment for burglarizing a drugstore in Brundidge, Alabama, the property of Ronald Don Price.
The alleged burglary occurred about 2 a. m., April 28, 1979, at which time a cold drink vending machine in the store was broken into and a quantity of coins was taken; also some pills in bottles were taken and maybe some other items.

*1004 I
Appellant asserts that the defendant's arrest was unlawful because the officers who stopped him and made the arrest acted without probable cause. We note that on cross-examination defense counsel asked Officer Fernald if he was telling the court that the arrest was based on mere suspicion. From the record:
"A No, sir, it was based on my probable cause."
Our review of the evidence supports our statute, infra. We will now allude to some of the evidence which we think is pertinent to the issue of reasonable cause required by our statute.
Officer Charles Harris, on duty as a police officer for the city of Brundidge, a small urban area in Pike County, testified that the first time he drove by the burglarized drugstore, the lights were on as usual, but on the second patrol by the store he noticed that the inside lights were off. The lights were usually on. The second patrol was around 2 a. m., on April 28, 1979. Just before he observed the lights were off, he saw "the car leaving." He did not recognize anybody in the car. The departing car was a green Pontiac with paint marks on the back of it. There was a C.B. antenna in the middle of the trunk. He already had the tag number.
The car was going north on Main Street "through the red light." He followed the Pontiac to North Main Street where he (the officer) turned around and went back to the drugstore "and the lights were out." He then called his partner, Officer Lott, with whom he checked the lights. Officer Harris found the front door unlocked. Prior to this the witness had already called the dispatcher and given him a description of the car. He sent in the description when he saw the car leaving the drugstore. He was suspicious then. Officer Harris went to Troy and identified the car as the one he saw in Brundidge.
On cross-examination, Officer Harris testified that when he first saw the Pontiac he was "on patrol of D (doors) and A (alleys)." He saw the car as it was leaving the drugstore. When he saw the Pontiac (in motion) leaving the drugstore it was on the wrong side of the street. The car, on leaving, was traveling at a high rate of speed which aroused "my suspicion." He testified that he wanted "to make sure whether the drugstore had been entered, because we got a call from Clayton that he was over around Clayton spooking around drugstores." At the time he saw the car leaving the officer did not know the drugstore had been entered. The officer only followed the Pontiac to the traffic light and turned around. He noticed when he returned that the Price Drugstore lights were out on the front. When the officer went to the back he noticed that the outside switch on the meter was pulled. When the witness saw the Pontiac, he was aware that it was the car that the Police in Clayton were talking about. He could not describe the driver of the Pontiac other than that he was a white male.
"Q Now, taking what you knew at that time to look out for this car, the car pulling away from the vicinity of the front of Price's Drug Store leaving at an excessive rate of speed did you become suspicious?
"A Right.
"Q When you went back from the stop light what was the purpose of you returning to Price's Drug Store?
"A To see whether the drug store had been entered.
"Q So you were going to confirm
"A Right.
"Q Whether anything had happened?
"A Right.
"Q Would that be investigative procedure?
"A Right."
The witness testified that as soon as the defendant left the city of Brundidge, he gave the information to the dispatcher in Brundidge who alerted Troy, in which direction the Pontiac was headed.
"Q As soon as the defendant left the City of Brundidge did you alert the police department in Troy, Alabama?
*1005 "A No, the dispatcher did. After I gave it to the dispatcher in Brundidge they alerted Troy.
"Q On this alert what did you tell the dispatcher in Brundidge to relay to the City of Troy?
"A Well, I dispatched that there was a green Pontiac leaving the scene of the drug store with the paint marks in the back with the CB antenna in the middle of the trunk leaving at a high rate of speed going north on North Main Street."
* * * * * *
"Q Did you ever subsequently report that the drugstore had been broken into to the dispatcher?
"A Yes, I did. After I turned around and went back and I called in he transferred all of it to Troy then.
"Q Did he transfer that information to Troy?
"A Right."
Tony Stephens, the radio dispatcher for the police department in Troy, Alabama, testified that he was on duty in the early morning hours of April 28, 1979, and received a call from Brundidge concerning a vehicle and a breaking and entering of a drug store in Brundidge; that subsequent to receiving the dispatch from Brundidge he issued a dispatch to the patrol cars in Troy.
"Q Exactly what did you tell the patrol cars in Troy as a result of this message from Brundidge?
"A I advised them to watch for a green Pontiac with a CB antenna on the trunk and primer on the vehicle possibly coming north on U.S. 231. This vehicle was possibly involved in a breaking and entering of a drug store in Brundidge.
"Q Now, you did say that this was possibly involved in a breaking and entry of a drug store in Brundidge?
"A Yes, sir.
"Q Was a car stopped matching that description that you received a message on?
"A Yes, sir.
"Q Was this subsequent to you dispatching this information to the Troy Police cars?
"A Yes, sir, it was.
"Q Do you remember what officers called back?
"A Officer Pernall (sic) was the first one to stop the vehicle, he had got behind it and officers then backed him up after he had advised he had the car stopped.
"Q After you received that message from Officer Pernall (sic) did you call back to Brundidge?
"A Yes, sir, I called back to confirm they did have a B and E."
The witness stated, on cross-examination, that he had been listening to Brundidge and heard that they "had a possible B and E (breaking and entering) and I advised my units to watch for that car on all roads coming in possibly from Brundidge." He had already placed the Troy units on alert. The defendant had not been "pulled over" by Troy Officers before this alert went out. Officer Fernald stopped defendant. This officer was then aware that a window had been broken at the drug store in Brundidge.
"Q How many police cars were there?
"A One car stopped him.
"Q Who was that?
"A Officer Fernald. Then right after that back up units arrived.
"Q But isn't it true Tony at the time Fernald stopped him he was not aware that a burglary had taken place in Brundidge, Alabama.
"A We were aware that a window had been broken at the drug store in Brundidge as I understand it.
"Q Fernald was?
"A Yes, sir, I had advised them there was a possible B and E at Brundidge."
The state called Bruce Allen Fernald as a witness. Mr. Fernald was a police officer on duty April 28, 1979, in Troy. The witness testified that he was dispatched to "get on 231 By Pass and possibly head south to look for approximately a 1972, 1973, green Pontiac, that there had been a burglary involved in Brundidge and this vehicle was seen leaving the premises."
*1006 "Q Was there any further description on the Pontiac?
"A Yes, sir. He described that it was going to be they believed a Bonneville, that it was going to have a CB antenna on the back trunk and that it would have some primer spots on it."
The witness testified that upon seeing the described car he stopped it. It met the description. Mr. Cooper, the defendant, was driving the vehicle.
It appears from the evidence of this witness that before stopping the vehicle he was informed of its use in committing a burglary in Brundidge. This information was communicated by the Troy police dispatcher.
Section 15-10-3, Code of Alabama 1975, provides that an officer may arrest any person without a warrant on any day and at any time, for:
"(3) When a felony has been committed and he has reasonable cause to believe that the person arrested committed it;
"(4) When he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or. . . ."
We hold that the police officers, as shown by the record, had reasonable cause to believe that the defendant, the driver of the stopped vehicle, had committed the Brundidge burglary.
The record shows that earlier in the same night, the same vehicle was being operated in Clayton, Alabama, under such conditions as to create a suspicion that the operator was up to some unknown mischief. The record also shows that in Brundidge, at a later hour, the suspicious operation ripened into a reasonable cause to believe the operator had committed the alleged burglary of Price's Drugstore.
There is evidence, some of which we have noted, supra, of underlying circumstances which give rise to the dispatch; there is more than the naked fact that a radio dispatch had described an automobile that fit the description of the defendant's automobile. Paschal v. State, Ala., 385 So.2d 684(3).

II
Secondly, appellant contends that the trial court erred in allowing the state to introduce in evidence certain pills seized at the time of the arrest. This discovery, he contends, was the result of an illegal arrest. But we hold, supra, that the arrest was lawfully made on the basis of reasonable cause.

III
A third assertion of error is that the court erred in allowing Officer Grady Reeves to testify that appellant told him that, if he would carry him back to Brundidge, he would reimburse the owner of the store and not to arrest him because he had just gotten out of the penitentiary in January and had twelve more years to do on parole.
It appears in the record that Officer Reeves, while transporting defendant from the point of his arrest to jail, never interrogated him in any manner; neither did he tell defendant of his Miranda rights nor did anyone in his presence so inform defendant. It appears that Officer Wiggins told Officer Reeves as follows:
"Q Had you ascertained whether he had been given his rights or not?
"A Yes, sir. When I took him up to my car I asked Sgt. Wiggins has he been advised of his rights. He said, `Yes, I have advised him of his rights.'
"Q When you say rights, we are talking about Miranda.

"A Miranda warning, yes, sir."
We think the record clearly shows that defendant voluntarily started talking without any pressure or inducement from Officer Reeves.
When the state offered these voluntary statements before the jury, defendant's counsel objected as follows:

*1007 "MR. DOZIER: Your Honor, again I object on the grounds that the defendant in his case was not advised of his constitutional rights and to admit said statement would violate his constitutional rights.
"THE COURT: Overruled."
The record fails to show that there was any objection by defendant to these statements introduced at the in camera hearing. Defendant is limited to his specific grounds of objection and cannot assert other grounds. All other grounds are waived. The trial court will not be put in error on grounds not assigned in an objection. Andrews v. State, Ala.Cr.App., 359 So.2d 1172(13).
It is to be noted Officer Wiggins testified that after he saw the pill bottles lying on the ground he arrested the defendant Cooper and read his Miranda rights to him. The rights so read to him appear in the record.
Officer Reeves testified that when he arrived on the scene, Mr. Cooper was beside his vehicle and Fernald, Sgt. Wiggins and Officer Pugh were there. They (the officers) had stopped his vehicle there and defendant was obviously under arrest. He was handcuffed, Officer Reeves then put defendant in his (Reeves) car and took him to jail. While enroute the voluntary statements, supra, were made.
Thus, it appears that only a very short while elapsed between the time Officer Wiggins advised the defendant of his Miranda rights and the inculpatory confession, supra. Under the circumstances the warning to defendant of his Miranda rights was sufficient and a repetition of such rights while the defendant was enroute to jail was not necessary. Johnson v. State, 56 Ala.App. 582, 324 So.2d 298(1), cert. den., Ala., 324 So.2d 305.
The defendant did not take the stand nor did he offer any witnesses.
The evidence in the record supports the jury verdict. The rulings of the trial court were free of error. The judgment is affirmed.
The foregoing opinion was prepared by the Honorable BOWEN W. SIMMONS, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of § 6.10, of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.

On Rehearing
BOWEN W. SIMMONS, Retired Circuit Judge.
Appellant-defendant, through counsel, calls attention to certain objections made at the in camera hearing regarding the admissibility of appellant's statements.
However, as noted in our original opinion, the appellant had been properly advised of his constitutional rights by Sergeant Wiggins, and, moreover, the statements in question were made voluntarily by the appellant while being transported from the scene of his arrest to jail, and were not the result of any custodial interrogation. A proper voluntariness predicate was established by this record.
As pointed out in our original opinion, such statements were properly admitted in evidence at trial.
OPINION EXTENDED, APPLICATION OVERRULED.
All the Judges concur.