[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 567 
Phillip Musgrove was convicted of the capital murder and kidnapping of Deborah Lynn Burks in violation of Alabama Code 1975, § 13A-5-40(a)(1) and sentenced to death by electrocution. Six issues are raised on appeal.
The facts, as recorded by the trial judge in his sentencing order, recount a bizarre tale of criminal conduct, torture, and murder:
"I. FINDINGS OF FACT SUMMARIZING THE CRIME, AND, THE DEFENDANT'S PARTICIPATION IN IT
"At approximately 9:00 a.m. on the morning of Friday, November 11, 1983, the owner/manager *Page 568 
of the Frank Ann Motel in Huntsville, Madison County, Alabama (Mr. S. Patel) discovered the bound, gagged, and naked body of a young, white female lying face-down in the shower stall of Room 15. He immediately called the Huntsville Police.
"Police investigation established that Room 15 had been leased on Wednesday, November 9, 1983 (and the lease extended for an additional day on November 10th) by a white male who had identified himself on the motel registration card as 'Phillip Musgrove.' In addition, the motel owner/manager was shown a 'photographic line-up' of six white males (State's Exhibit 3). He selected the photograph in the middle of the top row as that of the individual with whom he had dealt on November 9th and 10th. That photograph was of the defendant (and, apparently, had been taken of him on January 1, 1978, when defendant was booked on the charge of Driving Under the Influence: his only previous arrest).
"An 'All Points Bulletin' (APB) for the arrest of Phillip Musgrove then was transmitted from Huntsville via the NCIC network. On the evening of the same day — Friday, November 11, 1983 — a homicide investigator with the Montgomery Police Department (Robert W. Davis) drove to the Day's Inn Motel in Hope Hull, Alabama. He discovered an automobile parked in front of Room 117 which matched the APB description: i.e., a two-door, Rust/Burnt-Orange colored, 1978 Chevrolet Nova bearing the Madison County tag attributed to defendant. A check with the motel's clerk confirmed that Room 117 was leased to a white male who had identified himself as 'Phillip Musgrove.' At that point, Officer Davis proceeded to the room. He was accompanied by Montgomery Police Officers L.O. Perdue and R.T. Ward, and two unidentified Deputies from the Montgomery County Sheriff's Department. The time was approximately 8:00 p.m.
"Upon being admitted to the motel room, the occupant identified himself as Phillip Musgrove. His 'Miranda rights' and warnings were read from both sides of a standard, billfold card. The defendant acknowledged that he understood his rights, and, that he wanted to 'go ahead and talk, and get it over with.' However, he was not questioned at that point. Rather, he was taken into custody. The following items of evidence were removed from his clothing: a large, two-bladed, folding Case knife (State's Exhibit 5); a key to Room 116 of the Catalina Motel in Huntsville (State's Exhibit 16); and, a key to Room 15 of the Frank Ann Motel (State's Exhibit 17). In addition, when defendant's automobile was driven from the motel to the Montgomery Police Department by Officer Davis, a bayonet (State's Exhibit 4) was discovered under the driver's seat.
"Upon arrival at the Montgomery Police Department, defendant was readvised of his 'Miranda rights' and warnings, but this time by means of a standard written form which Officer Davis completed by filling-in the blank spaces with a typewriter. Again, defendant acknowledged that he understood his rights, and, that he desired to discuss the events which had led to his arrest. Officer Davis required defendant to sign the form (State's Exhibit 1), and then proceeded to question him. Defendant gave an incriminating statement, and then was placed in a jail cell to await the arrival of Huntsville Police Officers. The time was approximately 9:30 p.m.
"During the early morning hours of the following day (Saturday, November 12, 1983), two members of the Huntsville Homicide Unit (Officers Danny Cox and Wayne Sharp) arrived in Montgomery. Before questioning the defendant, they again advised him of his 'Miranda rights' and warnings. Defendant again acknowledged that he understood and desired to discuss the incident. He again gave an incriminating statement.
"Defendant related the events which led to his arrest on at least three occasions prior to trial: first to MPD Officer Davis; second to HPD Officers Cox and Sharp; and third to his retained psychologist, Dr. Allen Shealey. All three statements were consistent in material respects, and varied only in the amount of detail supplied by the defendant. The following summary of his *Page 569 
statements is a composite of the testimony received at trial.
"Defendant described having met the victim, Deborah Lynn ('Debbie') Burks, in a bar two or three months prior to her death. She was a dope addict — 'a junkie' — and he felt sorry for her. They began dating, and then living together. Defendant professed to having fallen in love with her. He spent his 'life savings' of approximately $7,000 for: dilaudid tablets to support her drug habit; for food, clothing, shelter, and entertainment; and for methadone treatment at a drug clinic in Birmingham in an effort 'to get her life straightened out for her.'
"When defendant's money ran out, however, the relationship soured. He and Debbie separated. But defendant alleged he was not able to sleep, or to keep Debbie off his mind. On Wednesday, November 9, 1983, defendant left his mother's house (where he had been living since his breakup with Debbie) and rented Room 15 at the Frank Ann Motel. That evening, he went looking for Debbie, and found her at 'Buster's Lounge.' He asked her to spend the night with him, and she agreed — saying that she would come to his room about nine o'clock. He went back to the motel and waited. When Debbie had not arrived by midnight, however, defendant drove back to Buster's Lounge. Debbie was sitting at a table with a man named Bob Selens, who was a former employer of the defendant and allegedly 'one of his best friends.' Bob Selens was drunk, and asked defendant: 'Do you mind if I screw your girl friend?' Defendant replied: 'That's between you and her.' Defendant again asked Debbie to spend the night with him at the Frank Ann Motel. She again agreed, but said she wasn't ready to leave; that she would come when the lounge closed (around 2 a.m.). Defendant left the bar, and returned to his motel room to wait.
"When Debbie Burks still had not come to the motel by 3:30 or 4:00 a.m. on November 10th, he once more went looking for her. He drove to the Catalina Motel in Huntsville, where Debbie had most recently been residing, but discovered Bob Selens' Datsun 280Z sports car parked in front of her room (No. 116: State's Exhibit 16). He left. He drove around for a time, or went back to his own motel room. He eventually drove back to the Catalina Motel. At this point, the evidence is unclear: defendant either saw Bob Selens leaving the motel in his car, or, defendant saw that Selens' car no longer was parked in front of Room 116. In either event, defendant drove to a telephone and called Selens' home. He asked Selens whether he had engaged in sex with Debbie: 'Bob, how did you do?' [Officer Cox]; or, 'Bob, you ain't been screwing Debbie have you?' [Dr. Shealey]. To which inquiry Selens responded negatively, saying that Debbie 'had three or four guys in line in front of me with money she had to take care of first, and then she was going to give me a "freebie" '; but Selens alleged that he had tired of waiting after several hours, and left.
"Defendant then telephoned Debbie Burks at her Catalina motel room, and again asked her to come to his motel. Debbie said that she had a 'friend' in the room who was passed out drunk, and that she did not want to leave him alone. Defendant persuaded her that the 'friend' would be all right if he was sleeping, and Debbie consented. Defendant then drove to the Catalina Motel and Debbie got into his car. On the way back to the Frank Ann Motel, defendant stopped briefly to purchase cigarettes and soft drinks. Allegedly, Debbie became angry over the fact that defendant had purchased her a Coke, instead of a Mello-Yello.
"After entering the motel room, they took off their clothes in preparation for getting into bed. Defendant asked Debbie to perform an oral sex act, but she refused. Defendant argued with her, saying that he was only asking for a 'simple thing,' that he loved her and she loved him, and that he had 'spent all this money on you and everything.' Debbie persisted in her refusal, saying that she was 'tired.' The argument apparently intensified — defendant professing not to be able to understand why Debbie would have sex with three or four other guys, and Bob Selens, but not him. Debbie denied having sex with Bob Selens (Dr. *Page 570 
Shealey), at which point defendant apparently confronted her with Selens' statement that she would have given him a 'freebie' if Selens had waited. To which Debbie responded: 'Well, Bob is a good looking guy.' Defendant grabbed her, and started choking her. Debbie agreed to perform oral sex, but 'at that point, sex was the furtherest thing from his mind' (Shealey). Defendant continued to choke her, and to slap her, to the point that she began to lose consciousness. And then he quit.
"Defendant got up. He took Debbie's blouse from wherever she had laid it when undressing, and ripped it into strips. He then either told her he was going to bind and gag her, or asked whether 'she minded if he' did so. According to Dr. Shealey: 'She said she didn't mind.' According to Officer Cox: 'He said she went for that. She trusted him.' In any event, defendant stuck a piece of the sleeve in her mouth. She spit it out, saying she couldn't breathe. But he re-inserted the piece into her mouth, and tied another piece around her head to hold the first piece securely. He then told Debbie to get up, to go into the bathroom, and to lie down in the shower stall on her stomach (Shealey). 'And then he said she walked willingly into the bathroom and lay down in the shower stall, face down' (Cox). With his knife he cut other pieces from Debbie's blouse, and used them to bind her hands behind her back, and to bind her feet.
"Thus helplessly bound, defendant began a series of grizzly acts upon his victim. He first used the point, or tip of one of the two weapons to inflict seven or eight puncture wounds on Debbie Burks' back (State Exhibit 8). He next used the blade of a knife to cut off her bra and panties. Then he 'started rubbing the knife across her back lightly, and then kept on cutting her' (Shealey). In all, defendant thus inflicted thirteen incised ('cutting') wounds to her back: six diagonally across the upper back, in the area of the right shoulder (State's Exhibits 21 25); two diagonally across the middle of her back (State's Exhibits 8, 21 25); and five vertically, running up-and-down the middle of the back (State's Exhibits 8 25). At this point, upon seeing what must have been a great amount of blood spilling from Debbie's body, the defendant told her:
 " 'You know, I've gone too far now. . . . I'm going to have to kill you. . . . What do you want me to do? Choke you to death, or do you want me to cut your throat?' And he said that she was just shaking her head no, shaking her head no.
 " 'So he showed me . . . that he just lifted her head up and ran the knife under her throat and cut it, and . . . he showed me like two different times he cut her throat with her head back. [HPD Officer Danny Cox: from transcript of pretrial hearing on motions to suppress.]'
"The State's forensic pathologist, Dr. Josefino Aguilar, testified that the cause of death was a large gaping wound at the junction between the lower part of the face, and the upper part of the neck of the victim. That wound severed (among other tissue) the tongue, hypopharynx, and the right and left common carotid arteries.
"In addition to that gaping wound which extended to the spinal column (there were 'a couple of cuts on the surface of the bone itself'), Dr. Aguilar also found three, superficial, incised wounds on the neck of the victim which ran along (and were connected to) the upper margin of the large, gaping neck wound.
"At that point, defendant got off his victim, and went back into the motel bedroom. But he thought he heard Debbie breathing. So, he went back into the bathroom and stabbed her six times in the back — five of which penetrated deep into the chest cavity, through the lungs (Aguilar). Apparently, these wounds were inflicted by the defendant's bayonet (State's Exhibit 4).
"It then was the morning of Thursday, November 10, 1983. Defendant washed his hands and knives off in the shower, over the body. He drank some beer (which was iced down in the bathroom lavatory), watched TV, and tried to sleep. Later in the day, he renewed his lease on the room for another night. He stayed in the room for the better part of that day, or longer, sleeping and eating: *Page 571 
 ". . . Phillip stated that he had his beer in the sink on ice, and he said, 'Every time I needed to wash my hands' — he said he was eating potato chips and Vienna sausage and knickknacks, as he called it, and he said every time he had to wash his hands, he would just turn the shower on over her body and wash his hands, and he said that's why her body was still wet [when it was discovered]. [HPD Officer Danny Cox: from transcript of pre-trial hearing on motions to suppress.]
"Late that night, or during the early morning hours of November 11th, defendant left the Frank Ann Motel and drove to Montgomery. He checked into the Hope Hull motel where he was arrested."
 I
The defendant argues that the searches of his motel room, his person, and his automobile were constitutionally impermissible because (a) he did not voluntarily allow the police into his motel room, (b) there was no search warrant, and (c) the searches were not conducted under any exception to the warrant requirement.
Ms. Burks' body was discovered on the morning of November 11, 1983, in a motel room registered to the defendant. An "All Points Bulletin" was issued and the Montgomery Police Department was notified because the defendant had relatives in Montgomery.
That night, the defendant's car was spotted at a motel in Hope Hull in Montgomery County. Montgomery police officers Davis, Ward, and Perdue, and two Montgomery County Deputy Sheriffs determined that the defendant was in the motel, went to his room, and knocked on the door. This was at approximately 8:00 p.m. Officer R.W. Davis testified that they knocked on the door and "[a] white male presented himself to us and identified himself as Phillip Musgrove." The officers told the defendant they "were police officers from Montgomery, here to talk with him in regards to an incident that happened in Huntsville where he was a suspect." It is not clear where the police actually were when they identified themselves.
 "Q. Okay. When you went to the room and he came there, did you ask him to come out of the room, or did you go into the room?
 "A. [Officer Davis]: No, sir. We came in, identified ourselves. He identified himself; we came in."
Officer Louis O. Perdue testified, "We knocked on the door. Phillip Musgrove came to the door. We told him who we were. We went into the room. At that time he was advised of his rights." Perdue testified that the defendant stated that he would "talk": "The only conversation we engaged with him was we explained the reason for being there and would like for him to go to headquarters. * * * He stated he would."
At trial, Officer Davis testified, "After we identified ourselves, we told him that we were here in response to Huntsville Police Department wanting him in regards to an incident that occurred there. He opened the door, stepped back, and we went inside and basically told him his rights, and basically that was it. He said no more." Davis stated that the defendant said that he understood his rights and said "he would go ahead and talk and get it over with now." He admitted that the defendant cooperated "to the fullest."
Officer Ward testified that "Musgrove opened the door. We identified ourselves as police officers, told him we needed to talk to him. * * * [J]ust almost immediately like we went into the room, and, after identifying ourselves, then entering the room, and asking if he was Phillip Musgrove." Ward stated that the defendant was "very cooperative."
Huntsville police officers arrived in Montgomery at 2:10 on the morning of November the 12th with a warrant for the defendant's arrest. That warrant had been obtained between 9:45 and 10:10 on the night of November the 11th.
 A. THE ARREST
The police are required to obtain a warrant before making an entry into a residence to arrest a suspect in the absence *Page 572 
of consent or exigent circumstances. Payton v. New York,445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). See also Welshv. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732
(1984); Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618
(1985). A suspect's "use of his motel room strictly for lodging insures the same expectation of privacy as if it were his home.United States v. Bulman, 667 F.2d 1374 (11th Cir. 1982) [cert. denied, Howard v. United States, 456 U.S. 1010, 102 S.Ct. 2305,73 L.Ed.2d 1307 (1982)]." United States v. Roper,681 F.2d 1354, 1357, n. 1 (11th Cir. 1982), cert. denied, Newton v.United States, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440
(1983). See also United States v. Newbern, 731 F.2d 744, 748
(11th Cir. 1984). Here, whether the officers were justified in arresting the defendant depends upon the existence of probable cause and exigent circumstances.
"Probable cause to arrest exists 'where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed.' " United States v. Pantoja-Soto,739 F.2d 1520, 1523 (11th Cir. 1984), cert. denied, Pantoja-Soto v.United States, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389
(1985). "Probable cause must be judged not with clinical detachment but with a common sense view to the realities of normal life." Wilson v. Attaway, 757 F.2d 1227, 1235 (11th Cir. 1985). "A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." United States v.Willis, 759 F.2d 1486, 1494 (11th Cir.), cert. denied,474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). See also Whiteley v.Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306
(1971) (police "entitled to act" on communication received through official channels such as radio bulletin).
Obviously, there was probable cause to arrest the defendant for murder. The police knew that Ms. Burks had recently been tortured and killed in a motel room registered to the defendant, whose photograph had been identified by the motel manager. This supplied ample probable cause for the defendant's arrest. See Barr v. State, 409 So.2d 976, 978
(Ala.Cr.App. 1981); Cooper v. State, 380 So.2d 1003, 1004-06
(Ala.Cr.App. 1980).
Our review also convinces us of the presence of exigent circumstances warranting the defendant's immediate arrest. "[T]he ultimate test for determining whether exigent circumstances exist justifying a warrantless entry 'is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.' "United States v. Cresta, 592 F. Supp. 889, 901 (D.Maine, 1984). "The term 'exigent circumstances', in conjunction with an arrest in a residence, refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v.Flickinger, 573 F.2d 1349, 1355 (9th Cir.), cert. denied,439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), overruled on other grounds, United States v. McConney, 728 F.2d 1195 (9th Cir.), cert. denied, McConney v. United States, 469 U.S. 824,105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "The exigent circumstances doctrine recognizes several common situations where the time consuming resort to a neutral magistrate for an arrest or search warrant is unnecessary, for example: hot pursuit, . . . fleeing suspect, . . . danger to arresting officers or the public from the suspect or the contents of a container, . . . mobility of the vehicle, . . . or mobility of containers which could not be detained without thwarting efforts to discover other conspirators. . . ." United States v. Kreimes,649 F.2d 1185, 1192 (5th Cir. 1981) (citations omitted). "The [Supreme] Court has recognized exigent circumstances in cases involving hot pursuit, . . . destruction of evidence, . . . and threats to public safety. . . ." United States v. Baldacchino,762 F.2d 170, 176 (1st Cir. 1985) (citations omitted). *Page 573 
 "In determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances, the court must consider: the gravity of the underlying offense; whether delay poses a threat to police or the public safety; the likelihood that the suspect will escape if not quickly apprehended; and whether there is a great likelihood that evidence will be destroyed if the arrest is delayed until a warrant can be obtained. See Welsh v. Wisconsin
[466 U.S. at 746] 104 S.Ct. at 2098; Warden v. Hayden,387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 [1967]; Dorman v.United States, 435 F.2d 385, 392 (D.C. Cir. 1970); 2 W. LaFave, Search and Seizure § 6.1 (1978)."Baldacchino, 762 F.2d at 176.
Here, the gravity of the underlying offense was of the highest nature. The defendant had committed an offense for which the death penalty was authorized. Although there was no evidence that the defendant was on a rampage or involved in a series of killings, the police had reason to conclude that they were dealing with a depraved individual who had tortured and slaughtered a bound, gagged, and helpless victim. The facts that the murder occurred in a small motel and that the defendant was located in another small motel are circumstances worthy of significance. The police had every reason to believe that the defendant was vicious and dangerous and armed with a dangerous weapon, a knife.
The police had reason to believe that the defendant was "in flight." From the information available to the police, he left Huntsville relatively soon after the murder. He was located near Montgomery where he had relatives. Finally, the facts indicating the possibility of the destruction of evidence are not especially significant here. In every criminal case, there exists the possibility that evidence will be destroyed. Here, there are no facts to justify a conclusion that this possibility was especially great or magnified.
Additionally, it should be noted that the arrest was made peaceably, without the use of any force, and with the defendant's cooperation. While the record does not show that the police had the defendant's consent or permission to enter his room, there was no objection by the defendant to the officers' actions. The record does not contain sufficient information for this Court to infer consent from the defendant's conduct in "stepping back" from the door, as Officer Davis testified.
Based upon these considerations, we find that the warrantless arrest of the defendant in his motel room was justified.
 B. THE SEARCH
After the police were inside the defendant's room, they advised him of his Miranda rights and "patted him down" for weapons. A lock-blade case knife was found in the defendant's pants pocket. A Catalina motel room key was found in another pants pocket. The defendant's jacket was "laying there on the bed or on a chair." In the jacket pocket Officer Perdue found the key to Room 15 at the Frank Ann Motel. Officer Davis stated that "we . . . put the jacket on the defendant, . . . per his request." Officer Perdue testified, "I think it was cool. We was going to, you know, let him put it on or put it over his shoulders."
The defendant was taken outside the motel room and handcuffed before he was taken to police headquarters. Officer Davis drove the defendant's car to the "city morgue" where it was placed "under lock and key until the Huntsville Police Department got there." Although Officer Davis testified that they "didn't search the car per se," he did find a bayonet under the front seat. When asked how he got the keys to the defendant's car, Officer Davis testified, "We got them from — I don't know whether they got them from him. He let me drive his car to headquarters." Davis subsequently testified that he got the keys from the defendant.
From the defendant's motel room, the only seized items introduced into evidence were the case knife, and the two motel keys. The warrantless seizure of each of these items was justified under the search incident to arrest exception to the warrant *Page 574 
requirement. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034,23 L.Ed.2d 685 (1969). In making this finding, we reject the defendant's argument that he was only arrested when he was handcuffed outside his motel room before being transported to police headquarters. "[A] person 'is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. * * * [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' "Cox v. State, 489 So.2d 612, 618 (Ala.Cr.App. 1985).
We find no justification for the seizure of the bayonet from the defendant's car. The Attorney General's reliance onNew York v. Belton, 453 U.S. 454, 101 S.Ct. 2860,69 L.Ed.2d 768 (1981), is obviously misplaced because the defendant was not an occupant of the car at the time of the arrest. Coolidgev. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564
(1971). There is not enough evidence in the record for this Court to find that the defendant consented to a search of his car. This claim was never made or argued in the trial court.
The State has never argued that the bayonet was admissible because it inevitably would have been discovered or obtained as a result of a routine inventory of the car. In Nix v.Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court recognized an "inevitable discovery" exception to the exclusionary rule, holding that "if the Government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." 467 U.S. at 447,104 S.Ct. at 2511, 81 L.Ed.2d at 389. See generally, 3 W. LaFave, Search and Seizure § 11.4 at 620-28 (1978); Appel, "TheInevitable Discovery Exception to the Exclusionary Rule," 21 Crim.L.Bull. 101 (1985).
Other courts interpreting the inevitable discovery rule have determined that evidence discovered during an illegal automobile search is nevertheless admissible if it inevitably would have been obtained as the result of a routine inventory of the vehicle. Carlisle v. State, 98 Nev. 128, 642 P.2d 596
(1982); Clough v. State, 92 Nev. 603, 555 P.2d 840 (1976). See also People v. Roth, 66 N.Y.2d 688, 487 N.E.2d 270, 271,496 N.Y.S.2d 413, 414 (1985) (inevitable discovery rule inapplicable because police allowed accused to remove incriminating personal property from vehicle before it was impounded). Cf. United States v. Andrade, 784 F.2d 1431 (9th Cir. 1986) (drugs would have been discovered as part of routine inventory of accused's personal property during booking procedure); People v. Hoskins, 78 Ill.Dec. 107, 101 Ill.2d 209,461 N.E.2d 941, cert. denied, Hoskins v. Illinois,469 U.S. 840, 105 S.Ct. 142, 83 L.Ed.2d 81 (1984) (same).
There was no evidence in the present case to prove that, absent the illegal search of the defendant's automobile, the police would have conducted a routine inventory of the vehicle and would have inevitably found the bayonet. SeePeople v. Montgomery, 128 Misc.2d 463, 489 N.Y.S.2d 975, 977, n. 1 (N.Y.City Crim.Ct. 1985) (no evidence that inventory of shoplifter's personal belongings was routine procedure by department store).
 "The significance of the word 'would' cannot be overemphasized. It is not enough to show that the evidence 'might' or 'could' have been otherwise obtained. Once the illegal act is shown to have been in fact the sole effective cause of the discovery of certain evidence, such evidence is inadmissible unless the prosecution severs the causal connection by an affirmative showing that it would have acquired the evidence in any event. In order to avoid the exclusionary rule, the government must establish that it has not
benefitted by the illegal acts of its agents; a showing that it might not have so benefitted is insufficient." *Page 575 
Maguire, "How to Unpoison the Fruit — The Fourth Amendment and the Exclusionary Rule," 55 J.Crim.L.C. P.S. 307, 315 (1964) (quoted in Stokes v. State, 289 Md. 155, 423 A.2d 552, 557
(Md.Ct.App. 1980).
We cannot assume, as the Nevada Supreme Court did inCarlisle, supra, and Clough, supra, that because the police had possession of the vehicle "they would have been justified in conducting an inventory [and] [d]uring this inventory, the police would inevitably have found" the evidence. Both Carlisle
and Clough were decided prior to the United States Supreme Court's decision in Nix v. Williams, which unmistakably placed the burden of proving the existence of "inevitable discovery" upon the State.
 "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." 467 U.S. at 444, 104 S.Ct. at 2509.
 "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." 467 U.S. at 445, no. 5, 104 S.Ct. at 2510, n. 5.
Despite the illegal seizure of the bayonet from the defendant's car, its admission into evidence constitutes harmless error. In his confession, the defendant admitted killing Ms. Burks with his case knife. At trial, the defendant identified that knife as the knife he used to cut her throat. He admitted that he carried the bayonet in his car, but testified that he did not use it on Ms. Burks. The defendant also admitted that he told the police the truth. There was testimony from a forensic pathologist that the bayonet could have caused some of the wounds inflicted on Ms. Burks.
At trial, it was undisputed that the defendant tortured and killed Ms. Burks with a knife. The defense was insanity. Under these circumstances, any error in the admission of the bayonet was harmless.
The harmless error rule applies in capital cases. Ex parteWhisenhant, 482 So.2d 1241, 1244 (Ala. 1983). A defendant is not prejudiced by testimony of a witness which relates to uncontradicted matters. Yelton v. State, 294 Ala. 340,317 So.2d 331 (1974). In the following cases, the admission of a weapon has been held to constitute harmless error. Carroll v.State, 370 So.2d 749, 758-59 (Ala.Cr.App.), cert. denied,370 So.2d 761 (Ala. 1979) (admission of a second pistol which undisputedly was not the murder weapon); Mack v. State,337 So.2d 74, 76 (Ala.Cr.App. 1976) ("[I]f the pistol in evidence was not the one [used in the robbery], we do not see that defendant suffered any prejudicial injury by the mistake. The jury was certainly informed that a .22 pistol was brandished as a means of effectuating the robbery."); Walton v.State, 54 Ala. App. 317, 320-21, 307 So.2d 713 (1975) (shotguns admitted without prejudice even though there was no positive evidence who actually owned the guns where inference available that they were used by the defendant); Dickerson v. State,43 Ala. App. 694, 698, 200 So.2d 487, cert. denied, 281 Ala. 718,200 So.2d 492, cert. denied, 389 U.S. 994, 88 S.Ct. 496,19 L.Ed.2d 489 (1967) (The victim "identified defendant as the man who robbed him at gun point. It is immaterial whether this was the exact gun used in the robbery."); Hayes v. State,33 Ala. App. 364, 366-67, 33 So.2d 744 (1948) ("It is not disputed in the evidence that the defendant shot Mr. Bradford five times with a pistol. * * * [I]n view of the undisputed evidence in the case, we cannot see how the introduction of this pistol could have in any way harmed the appellant."). See also Gautneyv. State, 46 Ala. App. 102, 104, 238 So.2d 900 (1970) (no error in admission of pistol defendant had in his pocket which was not shown to have been used in connection with the crime charged).
 II
The defendant argues that his confessions were involuntary because he was *Page 576 
intoxicated from alcohol and drugs when he waived his rights and confessed.
At the hearing on the motion to suppress, the defendant testified that on November 12, 1983, he drank two six-packs of beer during the day. He stated that he took at least forty or more Xanax tablets around 6:30 or 7:00 that night in an attempt to kill himself. The defendant was arrested at approximately 8:00 p.m. He made a statement at 8:20 and again at 4:30 the next morning. If the testimony of the defendant and that of his expert medical witnesses is accepted as true, the defendant could not have knowingly and intelligently waived his Miranda rights.
However, several police officers testified that the defendant was not intoxicated from either alcohol or drugs. The standards for appellate review of a trial judge's determination of the admissibility of a confession were enumerated in Williams v. State, 461 So.2d 834, 838
(Ala.Cr.App. 1983), reversed on other grounds, Ex parteWilliams, 461 So.2d 852 (Ala. 1984):
 "(1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 134243, 10 L.Ed.2d 513
(1963). (2) 'The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542
(1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. '(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977), and cases cited therein. 'Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978)."
Applying these principles to the facts of this case, we find that the defendant's confessions were voluntary and properly admitted into evidence.
 III
The defendant argues that the evidence of his insanity was so overwhelming and uncontradicted that the jury's verdict is unsupported by the evidence. Clinical psychologists Alan Shealy and John Haney testified as defense witnesses on the issue of the defendant's sanity. Both psychologists diagnosed the defendant as suffering from an anxiety disorder characterized by agoraphobia with panic attacks. In contradiction of their testimony, psychiatrist Alexander Salillas testified on the State's case in rebuttal that the defendant did not suffer from a mental disease or defect at the time of the crime. On cross examination, the defendant admitted that he sent a letter to the trial judge in which he requested the death penalty and stated, "I am sure by now you have received a copy of my report from Taylor-Hardin and realize that I am as sane as you are or anyone else."
Here, the evidence of the defendant's insanity from both expert and lay witnesses was disputed and was contradicted by evidence presented by the State. A consideration of all the testimony presented at trial shows that the evidence of the defendant's insanity was neither so strong nor overwhelming as to mandate that the jury find that the defendant was insane at the time the crime was committed. Compare Ex parteTurner, 455 So.2d 910 (Ala. 1984); Clark v. State,475 So.2d 657 (Ala.Cr.App. 1985). Conflicting evidence always presents a question only the jury can answer. *Page 577 
Here, there was a wealth of evidence that the defendant acted in an enraged fit of jealousy and revenge. "Care must be maintained, however, that in commiserating and protecting this pitiable class [of the criminal with a diseased mind], which appeals so loudly to our sympathies, we do not break down all legal barriers to crime, and leave society at the mercy of those whose evidence of insanity consists in their supreme depravity." Boswell v. State, 63 Ala. 307, 316 (1879). "Although there seems to be one school of thought to the effect that one who commits a crime is necessarily to some extent so mentally deranged as to excuse or mitigate the crime and that the worse the crime the greater the derangement, such sentimentalism finds no support in law or logic." Barfield v.State, 54 Ala. App. 15, 22, 304 So.2d 257 (1974).
In his written order imposing the death penalty, the trial judge found that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired and that this factor was not a mitigating circumstance.
 " '(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;'
 "Although the terms used in this subsection of the statute and the subsection making 'the influence of extreme mental or emotional disturbance' a mitigating circumstance [Ala. Code § 13A-5-51(2)] are distinctly different, our courts have, nonetheless, discussed the two sub-sections together in some cases. See, e.g., Lewis v. State, 380 So.2d 970, 977 (Ala.Crim.App. 1979); Kyzer v. State, 399 So.2d 317, 330
(Ala.Crim.App. 1979), rev'd on other grounds sub nom. Ex parte Kyzer, 399 So.2d 330 (Ala. 1981).
 "Even so, this Court believes there is a difference between the two sub-sections as distinctive as the dissimilarity in the words employed; and, that the present sub-section is intended to apply to severe mental illness (such as the psychotic disorder of paranoid schizophrenia) and severe impairment caused by delusional thinking. [See, e.g., State v. Steelman, 126 Ariz. 19, 612 P.2d 475, 483 (1980) (construing comparable Arizona statute); Colquitt, supra, 304-305.] The Court recognizes that, even though (as in this case) the evidence may not be sufficient to justify a jury in finding the defendant not guilty by reason of mental disease or defect under Ala. Code § 13A-3-1, the evidence still may be sufficient to constitute a mitigating circumstance under this sub-section. See, e.g., Lewis v. State, supra, at 977:
 "On the post-verdict, pre-sentence hearing, . . . the extent of subnormal mental capacity does not have to measure up to the applicable test necessary to show a lack of sufficient competency to stand trial or a state of insanity that makes one incapable of [i.e., not legally responsible for] committing a crime.
 "After carefully reviewing all of the evidence, however, this Court finds that this mitigating circumstance is not a factor in this case. Dr. Shealey's conclusionary opinion that defendant could not control his behavior, or conform his conduct to the requirements of law, was rebutted by his own testimony. On direct examination Dr. Shealey testified that defendant:
 "was not psychotic [i.e., he did not suffer from 'a major mental disorder, characterized by being out of touch with reality']. . . . He did not have a major psychiatric [thought] disorder, such as schizophrenia. . . . He did not have any kind of major depression.
 "Later, when testifying about defendant's MMPI personality profile, Dr. Shealey stated that defendant's profile was not consistent with the profile of a person 'who is anti-social, psychopathic, [or who] can get into trouble quickly.' Rather, defendant was 'very passive, and not somebody who acted out his anger' under the influence of a severe mental impairment. And, defendant does not have a subnormal IQ, but is of 'average intelligence.' *Page 578 
 "When Dr. Shealey's testimony is coupled with the State's rebuttal evidence from a member of the Lunacy Commission which examined defendant prior to trial (Alexander A. Salillas, M.D.), it is clear that the State carried its burden of disproving this circumstance by the preponderance of the evidence, at least. (This Court is of the opinion that the State disproved it beyond a reasonable doubt.)"
However, the trial judge did find that the defendant was under the influence of an extreme mental or emotional disturbance on the date of the crime.
"There can be no question about the fact that defendant suffered from a 'personality' or 'anxiety' disorder prior to this offense. On two occasions before the crime, defendant voluntarily sought psychiatric assistance at the Charter-Retreat Hospital in Decatur, Alabama. During the course of his first admission (March/April 1982), the diagnostic impression of John R. Haney, Ph.D. (Director of Psychological Services) was: '1. Agoraphobia with underlying depression, 2. Paranoid personality traits, 3. Episodic alcohol [sic] abuse.' [State's Exhibit 26: page 2.] The discharge summary of defendant's psychiatrist (George Twente, M.D.) was 'Agrophobia' [sic] and 'Episodic alcohol abuse.' [See the documents produced by defense counsel prior to trial in accordance with Temporary Rule of Criminal Procedure 18.2.] Based upon his examination of defendant subsequent to the offense, Dr. Allen Shealey testified that defendant suffered from 'agoraphobia with panic attacks' (which he variously described 'disorder'; Dr. Haney called it both a 'personality disorder' and an 'anxiety disorder.').
"Thus, all three experts were consistent in their diagnosis of agoraphobia. Generally speaking, agoraphobia is an abnormal fear of being in large, open places with numbers of people, such as bus stations, subways, parks, department stores, or shopping malls. (Shealey Haney) It is a 'mental illness' listed in the 'Diagnostic Statistical Manual.' (Haney) It is 'characterized by intense anxiety in social situations: being around people, being out in public situations, and panic attacks.' (Shealey) The onset of the 'panic attack' is manifested by such things as: a sudden surge of intense anxiety, dread, and apprehensiveness; a sense that one can not breathe; a racing heart; a flushed face; and a heavy sweat. (Shealey Haney) The classic response of one who suffers from this disorder is to retreat from the threatening situation, and to seek sanctuary in a 'safe place' away from society and social contacts. Hence, the significance of the 'cabin in the woods' which defendant constructed on a remote 50 acre plot near his father's business (the St. Clair county recreation area known as 'Horse Pens 40').
"But, significantly, none of the symptoms or manifestations of 'agoraphobia with panic attacks' were present in the circumstances surrounding this offense. All events occurred in Room 15 of the Frank Ann Motel, with only defendant and Debbie Burks present. And defendant did not retreat, but attacked. Moreover, neither Dr. Shealey nor Dr. Haney established a satisfactory linkage between the symptoms or manifestations of 'agoraphobia with panic attacks', and, the criminal acts of defendant. [NOTA BENE: This Court hastens to add, however, that the preceding comments do not mean that such diagnostic testimony is being discarded, and not taken into consideration by the Court. Rather, this Court recognizes that such disorder is a significant aspect into account, and given careful consideration in mitigation of sentence. Ala. Code §13A-5-52. See also, e.g., Eddings v. Oklahoma, 455 U.S. 104,102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Clisby v. State,456 So.2d 86 (Ala.Crim.App. 1982), rev'd and remanded withinstructions, 456 So.2d 95 (Ala.), remanded forreconsideration, 456 So.2d 98 (Ala.Crim.App.), opinion afterremand I, 456 So.2d 99 (Ala.Crim.App.), opinion after remandII, 456 So.2d 102 (Ala.Crim.App. 1983), aff'd sub nom. Exparte Clisby, 456 So.2d 105 (Ala. 1984).]
"Even so, in contrast with the sixth mitigating circumstance discussed supra [i.e., Ala. Code § 13A-5-51(6)], the present mitigating circumstance contemplates a disturbance of the mind which might exist separate *Page 579 
and apart from a mental disease or defect (such as agoraphobia with panic attacks). See, e.g., Colquitt, supra, at 301302.
"Moreover, and most importantly, the very same 'psychologically significant events' [Dr. Haney's phrase] in the childhood of defendant which produced his anxiety disorder also played a role in the criminal acts for which he stood trial. Dr. Haney testified that defendant's agoraphobia was 'a manifestation of a long history of social and emotional maladjustment.' And so also (in effect) did Dr. Shealey, who based his testimony and opinion 'upon [defendant's] history.' This crime wasanother manifestation of those same developmental abnormalities (which are discussed below).
"The defendant has a very low sense of self-worth and self-esteem. This sense of self undoubtedly stems from many events, but the following were pointed out in particular:
 "(a) In the first grade defendant's teacher humiliated him: 'She made him get up in front of the class and tell them he was stupid, and couldn't learn.' (Shealey) His mother was a school teacher, defendant felt he was 'a failure and disappointment to his mother. . . . And he felt that, once again, he was not good enough for his family.' (Shealey) That incident 'cemented his sense of failure and worthlessness,' and made him feel that he was the Musgrove family's 'black sheep.' (Haney)
"Defendant did not relate well to females, especially those outside his family circle. In the words of Dr. Haney (State's Exhibit 26):
 "In his response to the sentence completion item, Phillip reported his biggest problem as 'no one to talk to.' Apparently, Phillip has cut himself off from relationships because of fear of entanglement, but needs a stronger sense of relatedness. He seems especially distant from female figures.
"Again, this undoubtedly stems from many events, but the following were highlighted in the evidence:
"(a) By age nine, defendant could not hug his mother spontaneously because he felt he had disappointed her academically, and because he felt personally responsible for her perceived nervousness and anxiety. (Haney)
"(b) Defendant was self-conscious over physical deficiencies (e.g., an overbite, and being overweight).
"(c) Both psychologists described two school incidents (during the 5th and 8th grades) in which defendant developed or exhibited some affection for a female, only to have his innocent fantasies turned into ribald incidents of cruel laughter, derision, and mocking. 'That reinforced his sense of inadequacy with women, . . . and the treachery of women.' (Haney)
"(d) As a result of such experiences, defendant was 'too shy,' 'bashful,' and 'insecure.' (Shealey) He did not date in school, or during his tour of duty in the Navy. 'He couldn't get up the courage' to ask a girl out, for fear of further rejection and humiliation. (Shealey) His first sexual experience was with a prostitute in Barcelona, Spain, at age 20. Afterwards, while still in the Navy, he met a 'so-called "buy me a drink" hustler' at a bar, and he had four or five sexual encounters with her. 'But, he was so bashful . . . and so insecure that he couldn't talk to her without drinking five or six beers.' (Shealey)
"From such experiences, defendant developed an 'approach/avoidance conflict: he wanted, but was afraid of' women. (Shealey) He also had repressed feelings of anger over the rejection and humiliation he had suffered. But, he did not express it. Defendant was 'very passive, and not somebody who acted out his anger. . . .' (Shealey) He 'was too insecure to get mad,' and so he kept the anger bottled-up inside himself. (Shealey)
 "Test data suggested that Phillip was a fairly hostile and aggressive individual, but that he had behavioral controls when he was not drinking. Test data also suggested a proneness to alcohol abuse, proneness to paranoid thinking and a proneness to sexual pathology. However, he seemed to have enough ego-strength *Page 580 
to avoid these extremes of behavior. At times, however, he may become fatigued by the effort it takes to normalize his thinking and he may fantasize about withdrawing from the demands and responsibilities of social living. [State's Exhibit 26: Psychological Evaluation of Dr. Haney].
"The only occasion prior to this crime that defendant expressed his anger (i.e., to James Cash, over the run-away brush fire which threatened to destroy his cabin/sanctuary in the woods) resulted in physical threats, harassment, and his first, 'full-blown, panic attack' (which, in turn, led to his first admission to Retreat Hospital).
"Such events, it is fair to surmise, also led to defendant's affection for Debbie Burks. Because he felt inadequate with 'normal' women — and because he apparently felt that any overture to a normal woman would expose him to further rejection, humiliation, and hurt — defendant turned to a dope-dependent cripple. Only with such a woman could he feel secure and adequate. And when Debbie Burks expressed some care and concern for him as a person, he fell head over heels for her. Dr. Shealey even went so far as to describe defendant's initial encounter with Debbie Burks as his:
 "first date — in the sense of getting close, and caring about, and talking about himself and the other person. . . . The closest he had ever come to a real date, let me put it like that.
"Defendant was 'in love,' and he talked about marriage. They looked at engagement rings. He 'waited on her hand and foot.' He provided food, clothing, shelter, and drugs. He did 'anything she asked, thinking that she would love him if he did all these things for her. . . .' (Shealey) When his savings ran out, defendant sold possessions, and borrowed money from his father, in a vain attempt to kindle the fires of hope. But, when all the money was gone, so also was Debbie. She was drawn back to the street, and to prostitution, in order to satisfy the dominant lust of her life: drugs.
"Which leads inevitably to the fateful events of November 9th and 10th, 1983. All the elements came tragically together. Phillip's sense of inadequacy — over his appearance, his lack of occupation, and his relations with women — was contrasted starkly to the handsomeness, success and manliness of his friend and former employer, Bob Selens. Selens crushed Phillip's forlorn hope for faithful love. In the words of Dr. Shealey:
"Well, he believed [or deceived himself into believing] that she was not hustling, that she was being faithful to him, that she was going to reform, that they were going to get married, and this particular . . . incident of finding out that not only was she not being faithful, but that his friend that he looked up to . . . also had shamed and humiliated him, . . . that she was going to go to bed with him or give him a 'freebie,' or something or other, and that she had gone to bed with four or five other guys for money that night, and that he was told this by Bob Selens and, once again, humiliated, was like a balloon bursting of hopes of dreams.
"In the words of Dr. Haney, these events were the spark that ignited the underlying magazine of repressed resentments. What followed was a 'massive explosion' of the 'vast anger' and 'rage' that had 'been pent-up over twenty years.'
"Consequently, this Court finds, by a preponderance of the evidence, that Phillip Musgrove was under the influence of an extreme mental or emotional disturbance on the date of his crime."
It can clearly be seen from these findings of the trial judge that the evidence of legal insanity was not so overwhelming and uncontradicted that a directed verdict was warranted.
 IV
The defendant contends that the evidence does not sustain his conviction for the capital offense of murder-kidnapping because there is no proof of kidnapping in the first degree since there was no proof that Ms. Burks was abducted or restrained. *Page 581 
The indictment contained two counts charging murder during a kidnapping in the first degree under § 13A-5-40(a)(1), Code of Alabama 1975. Count one charged that the defendant caused Ms. Burks' death during his "abduction of, or attempt to abduct" Ms. Burks "with the intent to inflict physical injury upon her." Count two charged the "abduction of, or attempt to abduct" Ms. Burks "with the intent to terrorize her." The jury found the defendant "guilty of capital murder as charged in the indictment."
"A person commits the crime of kidnapping in the first degree if he abducts another person with intent to: * * * (4) Inflict physical injury upon him, . . . or (5) Terrorize him or a third person." Alabama Code 1975, § 13A-6-43(a). The term "abduct" is defined by statute: "To restrain a person with intent to prevent his liberation by either: a. Secreting or holding him in a place where he is not likely to be found, or b. Using or threatening to use deadly physical force." §13A-6-40(2). "Restrain" is also defined: "To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is 'without consent' if it is accomplished by: a. Physical force, intimidation or deception, . . ." § 13A-6-40(1).
The defendant argues that there is "absolutely no evidence showing that the deceased was forcibly taken into the motel room." Appellant's brief, p. 62. This argument misses its mark since "restraint" is "concerned with intentional, unlawful and nonconsensual removal or confinement." § 13A-6-40
Commentary (emphasis added). " 'Abduct' is defined as a very serious form of restraint, requiring an intent to prevent the victim's liberation, by substantial removal, isolation or concealment and/or the use of violence usually associated with traditional kidnapping." § 13A-6-40 Commentary (emphasis added). Under these definitions, the defendant could be guilty of kidnapping in the first degree if Ms. Burks voluntarily entered the defendant's motel room and was then intentionally and unlawfully confined or concealed against her will.
Alabama's Criminal Code definition of kidnapping covers situations of removal and confinement. Restraint involves "moving [a person] from one place to another, or . . . confining him either in the place where the restriction [of theperson's movements] commences or in a place to which he has been moved." § 13A-6-40(1) (emphasis added). Where confinement is involved, asportation of the victim is not always or necessarily required. Under our statute, the common law requirement of asportation is replaced by the intent with which the abduction is accomplished. See Model Penal Code § 212.1, p. 212 (1980). As one respected authority on criminal law has noted: "[S]ome states adopted a different plan for modernizing this offense [kidnapping] by substituting, for the original requirement of asportation, an intent to cause the victim to be secretly confined [citing Code of Alabama §§ 13A-6-40(2),13A-6-43 (1975)]. Under such a provision no movement of any kind is needed." R. Perkins and R. Boyce, Criminal Law, p. 231 (3rd ed. 1982). "The dominating element of the offense of kidnapping, . . . is the intent with which the acts enumerated in the statute are done." Doss v. State, 220 Ala. 30, 32,123 So. 231 (1929). See also Doss v. State, 23 Ala. App. 168,123 So. 237 (1929). A reading of our kidnapping statutes and the definitions of "abduct" and "restrain" makes it obvious that these provisions have broadened and enlarged common law kidnapping which required unlawful confinement plus asportation. See R. Perkins and R. Boyce, Criminal law p. 230 (3rd ed. 1982). "One may be secretly confined, although he had originally selected the secluded spot for some purpose of his own, if he is compelled to remain there against his will." Perkins at 232. See also Smith v. State, 63 Wis. 433,23 N.W. 879 (1885), which was cited with approval in Doss,220 Ala. at 32, 123 So. 231.
In his written order imposing the death penalty, the trial judge found: *Page 582 
"The jury's initial verdict, finding the defendant guilty of capital murder as charged in the indictment, establishes the existence of this aggravating circumstance. In the opinion of this Court, that verdict is supported by the evidence, beyond a reasonable doubt. Admittedly, the abduction of Debbie Burks commenced and ended in the bedroom and bathroom of Frank Ann Motel room 15. But, it nonetheless was shown by the evidence, beyond a reasonable doubt, that:
 "(a) Defendant intentionally or knowingly restricted Debbie Burks' movements unlawfully and without consent by 'physical force, intimidation [and/or] deception,' and by binding her hands and feet: thereby 'confining [her] . . . in the place where the restriction commence[d]. . . .' [Ala. Code § 13A-6-40(1).]
 " 'Restrain' is concerned with intentional, unlawful and nonconsensual . . . confinement of another person so as to 'interfere substantially with [her] liberty' or physical locomotion. It is a broad term covering various factual situations from the most serious cases down to relatively minor removals and brief confinements not involving any high degree of isolation, disappearance or violence. [Commentary to id.
(Emphasis supplied.)]
 "(b) Defendant restrained Debbie Burks with the intent to prevent her liberation by using deadly physical force. [Ala. Code § 13A-6-40(2).]"
There was abundant evidence that the abduction was with the intent to inflict physical injury upon Ms. Burks and to terrorize her. In his confession the defendant admitted that when he began sticking his knife in her back, "he was trying to scare her," and that he "told her that he was going to give her an option of being choked to death or having her throat cut."
Huntsville Police Officer Danny Cox testified that the defendant told him that "he got down over her and he got the point of the knife and he was just going to scrape it across her back very gently just trying to scare her." The defendant stated that after he had cut deeper than what he intended to he said, "Well, Debbie, looks like it's all over. If I let you go, you're going to run to the cops or to some of your friends and have them break my legs. The only thing left to do is kill you."
A forensic pathologist testified that Ms. Burks had been bound "at least fifteen or twenty minutes or better" before her death.
It is obvious from this testimony that the defendant restrained Ms. Burks with the intent to secretly confine her in order to prevent her from reporting his foul deeds. The evidence presented fully supports the conviction for murder and kidnapping.
 V
The defendant contends that Alabama's statute defining kidnapping in the first degree is unconstitutionally vague because the word "terrorize" is neither defined nor so reasonably clear as to prevent arbitrary and discriminatory enforcement. We disagree.
In overruling the defendant's motion for a judgment of acquittal based on this argument, the trial judge noted that, in the absence of a statutory definition, "I think the proper thing to do would be to turn to a definitive dictionary."
 "THE COURT: Webster's New Collegiate Dictionary and The Oxford English Dictionary, which I suppose is the definitive dictionary of the English language. For your information, The Oxford English Dictionary defines terrorize in one of its definitions as, 'to fill or inspire with terror, reduce to a state of terror, especially to coerce or deter by terror.' Webster's New Collegiate Dictionary defines terrorize as, 'to fill with terror or anxiety.' "
In instructing the jury, the trial judge gave these same definitions.
"Although penal statutes are to be strictly construed, courts are not required to abandon common sense. Absent any indication to the contrary, the words must be given their ordinary and normal meaning." *Page 583 
Walker v. State, 428 So.2d 139, 141 (Ala.Cr.App. 1982) (citations to authority omitted). All provisions of the Criminal Code "shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law, including the purposes stated in section 13A-1-3
[general purposes of Criminal Code]." Alabama Code 1975, §13A-1-6. We find that the statute under which the defendant was indicted and convicted "give[s] fair warning of the nature of the conduct proscribed and of the punishment authorized upon conviction." Alabama Code 1975, § 13A-1-3(2). "Words used in the statute must be given their natural, plain, ordinary, and commonly understood meaning." Alabama Farm Bureau MutualCasualty Insurance Company, Inc. v. City of Hartselle,460 So.2d 1219, 1223 (Ala. 1984).
"Webster's New Collegiate Dictionary defines 'terror' as 'to fill with intense fear or to coerce by threat or force.' . . . No magic words nor incantations on part of the witness is necessary to establish 'terror.' " Rogers v. State,687 S.W.2d 337, 341-42 (Tex.Cr.App. 1985) (defining "terror" as an element of aggravated kidnapping). "Webster's Third New International Dictionary (1981) casts some light upon the meaning of 'terrorize:' It may mean to fill with terror or anxiety; or to coerce by threat or violence. Perhaps, to excite fear; or to rule by intimidation. p. 2361. Terrorism may be the systematic use of terror as a means of coercion. It may create an atmosphere of threat or violence. p. 2361. Terror may denote stark fear; a state of intense fright or apprehension. p. 2361. Terrorize, as distinct from terrify, often implies an intentional affecting with terror. p. 912 (frighten). See also,Arto v. State, 19 Tex. App. 126[19 Tex.Crim. 126], 136 (1886), stating that terror means more than fright or alarm." Padgett v. State,683 S.W.2d 453, 457 (Tex.App. 4 Dist. 1983). "Terrorize means to cause extreme fear by use of violence or threats." State v.Schweppe, 306 Minn. 395, 237 N.W.2d 609, 614 (1975). "Terrorize
is not defined therein [by statute], so it must be measured by what men of common intelligence would consider it to mean. * * * The word 'terrorize' means to reduce to terror by violence or threats, and terror means an extreme fear or fear that agitates body and mind. Given limiting definitions for the words 'threat' and 'terrorize,' as those terms are understood by men of common intelligence, [the statute] proscribing terroristic threats survives any constitutional challenge for vagueness and uncertainty. . . ." State v. Gunzelman, 210 Kan. 481,502 P.2d 705, 709-10 (1972). Terrorize "means to reduce to terror by violence or threats, and terror means an extreme fear or fear that agitates body and mind." Armstrong v. Ellington,312 F. Supp. 1119, 1126 (W.D.Tenn. 1970), holding that the provision of a statute prohibiting walking or traveling for purposes of "terrorizing" any citizen was not unconstitutionally vague or uncertain.
 VI
The defendant contends that the trial judge erred in his refusal to charge the jury on the offenses of kidnapping in the second degree and unlawful imprisonment in the first degree as lesser included offenses of first degree kidnapping. The trial judge charged the jury on the lesser included offenses of murder, felony-murder, manslaughter, and criminally negligent homicide.
There was no evidence to support a conviction for kidnapping in the second degree, which merely involves the abduction of another, § 13A-6-44, or a conviction for unlawful imprisonment in the first degree which involves restraining another person under circumstances which expose that person to a risk of serious physical injury. § 13A-6-41.
"A defendant is not entitled to charges on lesser included offenses where the only reasonable conclusion from the testimony is that he is guilty of the crime charged or no crime at all." Ex parte Kennedy, 472 So.2d 1106, 1114 (Ala.), cert. denied, Kennedy v. Alabama, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985). "A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition *Page 584 
of the lesser offense . . ." Chavers v. State, 361 So.2d 1106,1107 (Ala. 1978).
 VII
In accordance with our statutory obligation imposed by § 13A-5-53, we have reviewed this case for any error involving the conviction and the propriety of the death sentence.
We have searched the entire record for any plain error or defect which might have adversely affected the defendant's substantial rights and have found none.
There has been no argument made that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor and there is no evidence to support any such contention.
Our review of the sentence proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of two aggravating circumstances: (1) the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit kidnapping, § 13A-5-49(4), and (2) "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses," § 13A-5-49(8). This first aggravating circumstance was inherent in the jury's verdict of guilty as charged. With regard to the second aggravating circumstance, we note and approve the findings of the trial judge:
 "Based upon the following considerations, this Court concludes that this aggravating circumstance was proven beyond a reasonable doubt:
 "(a) There was ample opportunity for defendant's hurt, jealousy, rage or passion to subside, and for reason to reassert itself. Indeed, after slapping Debbie Burks about, and choking her almost to the point of unconsciousness, defendant got up. He obtained her blouse from some other location in the motel room. Because he was undressed, he also had to obtain one (or both) of his knives from some other location. Time continued to pass as he gagged Debbie Burks, walked (or carried) her into the bathroom shower stall, and bound her hands and feet. And his initial acts, puncturing (or 'pricking') her back with the tip of a knife blade — while undoubtedly painful and terrifying to the victim — did not inflict serious or deadly physical injury.
 "(b) The testimony of Dr. Aguilar, based upon an examination of the hands and wrists of the victim (where the only blood remaining in the body was trapped behind the bindings), that those bindings were wrapped around Debbie Burks' wrists for 'at least fifteen or twenty minutes or better' before defendant inflicted the killing wound. That time must have seemed an eternity to the victim. The pain, suffering, fear, and terror she must have endured as the defendant carved upon her body is horrifying to contemplate.
 "(c) The number, and the character, of the wounds which defendant inflicted upon Debbie Burks prior to cutting her throat were heinous, atrocious, and cruel beyond rational contemplation. In the opinion of this Court, they were designed to inflict a high degree of pain and terror, with an utter indifference to — or even enjoyment of — the suffering of Debbie Burks.
 "(d) But, even at that point, defendant could have sought medical attention for Debbie Burks, and spared her life. Instead, he weighed the consequences of doing so, and verbally concluded he did not desire to face them. He told Debbie: 'If I let you go, you'll go to the Police; or, to your friends, and they'll break my legs.' For such considerations he decided to kill her, and cruelly told her so. Shockingly, he even asked Debbie how she preferred to die. Then he savagely cut her throat. Based upon the autopsy evidence, several cuts were inflicted by defendant to Debbie Burks' throat. Obviously, he was determined to take life. He cut to the vertebra. To ensure that life was extinguished, he repeatedly plunged a knife, probably his bayonet, deep into Debbie's back. *Page 585 
 "(e) The victim of the crime was bound and gagged, and therefore completely defenseless.
 "(f) The victim was placed in her helpless, defenseless condition by a person she apparently trusted.
 "This Court recognizes that all capital offenses are 'heinous, atrocious or cruel,' to some extent. But the degree of heinousness, atrociousness, and cruelty which characterizes this crime far exceeds that common to other capital offenses. The defendant's brutal actions are more vile than those condemned by our courts in such cases as Bryars v. State, 456 So.2d 1122
(Ala.Crim.App. 1983), rev'd on other grounds, 456 So.2d 1136 (Ala. 1984) (calculated double murder from ambush), and, Bush v. State, 431 So.2d 555
(Ala.Crim.App. 1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied [464 U.S. 865] 104 S.Ct. 200, 78 L.Ed.2d 175 (1983) (execution slaying of two witnesses to robbery). In the opinion of this Court, the defendant's savage acts even are more vile than those condemned in Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.), aff'd, 437 So.2d 1356
(Ala. 1983) (a rape-murder in which the victim was stabbed 66 times), because of the shockingly inhumane manner in which this defendant tortured his victim prior to brutally extinguishing life. Defendant's demonic acts were committed in a manner, and over a period of time, that undoubtedly inflicted an extreme degree of pain, suffering, and terror on the helpless victim."
The trial court found the existence of five mitigating circumstances: (1) The lack of any significant history of prior criminal activity; (2) the extreme mental or emotional disturbance produced by defendant's developmental abnormalities; (3) the anxiety disorder which also was a product of those same, "psychologically significant events" in the childhood and young adulthood of defendant; (4) the defendant's prior good character; and (5) "the advisory verdict of the jury, recommending by a vote of 10 to 2 that defendant be sentenced to life imprisonment without parole."
In determining that the aggravating circumstances outweighed the mitigating factors, the trial judge found:
 "After careful consideration of all circumstances, however, this Court finds that it is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances overwhelmingly outweigh the mitigating circumstances.
 "This was a horrifying, torture-murder, involving aggravated battery and mutilation of the victim prior to death. The most heinous aspect of defendant's crime is that, with utter depravity of mind, he hovered over his helpless victim for an extended time — a time that must have seemed, to her, an eternity — puncturing, slicing, and carving upon her writhing body. His acts demonstrate a pitiless indifference to her pain and suffering. One prays that defendant did not enjoy his vile acts, but the inferences of the evidence are susceptible to the conclusion that he did.
 "The United States Supreme Court has recognized that 'certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' [Gregg v. Georgia, 428 U.S. 153, 184, 96 S.Ct. 2909 [2930] 49 L.Ed.2d 859, 881 (1976).] This is such a crime. By any standards acceptable to civilized society, this crime was vile, outrageously wicked, and shockingly evil.
 "Ultimately, words are not adequate to describe the repulsive nature of defendant's deeds. But words are not needed. The photographic evidence depicts the utter depravity and abhorrent inhumanity of this crime more graphically than this Court ever could. The only penalty which will adequately reflect the gravity of this offense, promote respect for the law, and provide just punishment for the defendant is that of death."
Our independent weighing of the aggravating and mitigating circumstances convinces this Court of the propriety of the death sentence. *Page 586 
We are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.Thompson v. State, 503 So.2d 871 (Ala.Cr.App. 1986) (kidnapped-murder); Neelley v. State, 494 So.2d 669
(Ala.Cr.App. 1985), affirmed, Ex parte Neelley, 494 So.2d 697
(Ala. 1986); Owens v. State [Ms. 4 Div. 536, February 12, 1986] (Ala.Cr.App. 1986); Callahan v. State, 471 So.2d 447
(Ala.Cr.App. 1983), reversed, Ex parte Callahan, 471 So.2d 463
(Ala. 1985); Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), affirmed, 455 So.2d 905 (Ala. 1984), affirmed 470 U.S. 82,106 S.Ct. 433, 88 L.Ed.2d 387 (1985).
Our review convinces us that the defendant's conviction and sentence are due to be affirmed.
AFFIRMED.
All Judges concur.